# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANNA SOROKIN,<br><br>                    Petitioner,<br><br>v.<br><br>CARL E. DUBOIS, Orange County Sheriff; TOM DECKER, Field Office Director, Immigration and Customs Enforcement; TAE JOHNSON, Director, Immigration and Customs Enforcement; ALEJANDRO MAYORKAS, Secretary of the Department of Homeland Security; and  MERRICK GARLAND, Attorney General of the United States.<br><br>                    Respondents. | Civil File No.      21-9452<br><br><br>__PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241__ |

## ATTORNEY'S AFFIRMATION

**AUDREY A. THOMAS, ESQ.** an attorney duly licensed to practice law before the Courts of the State of New York, hereby states the following under oath and penalty of perjury:

1.      I am associated with the Law Office of Audrey Thomas, PLLC, attorneys for Petitioner, Anna Sorokin (Petitioner, Anna, Ms. Sorokin or Anna Sorokin, hereinafter).

2.      The following statements are made upon information and belief and are based on my conversations with Anna Sorokin, my conversations with members of

the Office of the Primary Legal Advisor, New York field office, my review of the files maintained by our offices for Anna Sorokin, my conversations with Todd Spodek, Esq., criminal attorney for Anna Sorokin, my conversations with members of the New York County District Attorneys' office, my conversations with Cheryl Kates, Esq. parole attorney for Anna Sorokin, and based on all prior proceedings held in connection to the removal proceedings for Anna Sorokin.

## **INTRODUCTION**

3.    Petitioner Anna Sorokin (Petitioner, Ms. Sorokin, or Anna hereinafter) is a 30-year German Citizen who has been detained by federal immigration officials since on or about March 25, 2021, without an opportunity for a bond determination.

4.    As of today, November 9, 2021, Petitioner will have remained in Respondent's custody for approximately eight months and will likely remain much longer as her case is currently on appeal.

5.    She petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.

6.    The Department of Homeland Security has detained Anna Sorokin not as a result of her criminal convictions but due to the fact that she remained in the United States past the period of her authorized stay after entering via the Visa Waiver Program.

7.    Petitioner's detention serves no purpose as she is not a flight risk and does not pose a danger to the public. Demore v. Kim, 538 U.S. 510, 532-33 (2003)

8.    Petitioner respectfully requests that this Honorable Court order her immediate release or, in the alternative, conduct its own custody hearing or in the alternative order Justice Conroy to recuse himself and order Respondents to provide her with a bond hearing which complies with the September 27, 2021 Order of Justice Furman where the government bears the burden of showing by clear and convincing evidence that Petitioner is a flight risk or danger to the community, and at which the court must consider alternative conditions or release with respect to both dangerousness and risk of flight. If the immigration Judge sets a monetary bond, he or she must consider Ms. Sorokin's ability to pay in determining the appropriate amount.

## PRIOR APPLICATIONS

9.    There was **ONE (1)** prior application made by this office on Petitioner's behalf for the relief sought herein and the petitioner has filed at least two prior applications for bond and an appeal of the Immigration Judge's decision denying bond before the Immigration Court and the Board of Immigration appeals.

## PROCEDURAL HISTORY

10.     There were two prior applications for bond in this matter where in the Immigration Court first denied bond on a finding that the Ms. Sorokin failed to prove she is not a danger to the community.

11.     The Ms. Sorokin filed and perfected her brief on appeal to the BIA.

12.     However, shortly after, the Court then issued a memorandum decision vacating his prior ruling and finding that the Immigration Judge does not have jurisdiction as Ms. Sorokin came in under ESTA and is in withholding proceeding only.

13.     The BIA ratified the Court's decision.

14.     The Ms. Sorokin then filed for bond again and the Court denied that determination.

15.     The Ms. Sorokin dissented and disagreed as she was not properly served and believed that at a minimum, she was entitled to a hearing on the issue of whether her entry under ESTA bars her from relief as it relates to this bond.

16.     Ms. Sorokin then filed a writ of habeas corpus before the United States District Court for the Southern District of New York under case number 1:21-CV-06588-JMF.

17.     On September 27, 2021 Justice Furman, a Judge of the District Court for the Southern District of New York, signed an order which states in pertinent part as follows:

a. "STIPULATION AND ORDER: IT IS HEREBY STIPULATED

AND AGREED, by and between the parties, that: This action shall be

and hereby is dismissed without prejudice and without costs or

attorney's fees to either party. The government shall, within 14 days of

the date of the entry of the Court's so-ordering of this stipulation on

the docket, provide Ms. Sorokin with an individualized bond hearing

before an immigration judge at which ICE bears the burden of

establishing, by clear and convincing evidence, that she poses a

danger to the community or a flight risk. At that hearing, the

immigration judge must consider alternative conditions of release with

respect to both dangerousness and risk of flight. If the immigration

judge sets a monetary bond, he or she must consider Ms. Sorokin's

ability to pay in determining the appropriate bond amount and further

set forth in this Order. SO ORDERED. The Clerk of Court is directed

to close this case. All conferences are canceled. (Signed by Judge

Jesse M. Furman on 9/27/2021) (rro)."

18.     Based on the foregoing on or about September 28, 2021, Ms. Sorokin filed

an emergency motion for bond and sought application of the principles of law

espoused by the Honorable Justice Furman in his order dated September 27, 2021

by the Immigration Court.

19.     On October 7, 2021, a Judge of the Immigration Court held a bond hearing and denied Ms. Sorokin's application for bond on a finding that Ms. Sorokin is a danger to the community because respondent is alleged to have posted "my rap sheet is bigger than y'all dicks" on social media and is alleged to have made several colorful statements to media outlets.

20.     Ms. Sorokin appealed the Immigration Judge's decision to the Board of Immigration Appeal and that appeal is still pending and awaits a briefing schedule.

21.     Ms. Sorokin now submits this writ seeking relief.

## DETENTION STATUS

22.     Ms. Sorokin is currently detained in Orange County Correctional Facility, at 110 Wells Farm Road, Goshen, NY 10924, after being released on probation by the Department of Parole on early release for good behavior.

23.     Prior to this, Ms. Sorokin filed an I589 application and the Immigration and Customs Enforcement (ICE) served her with notice of a court date for April 6, 2021 before the Immigration Judge at 201 Varick Street, New York NY.

24.     That matter was set down for a merits hearing on May 24, 2021 at 1:00 pm.

25.     Ms. Sorokin filed a motion for a continuance but that motion to continue was denied and she was ordered removed.

26.     Ms. Sorokin has since perfected her brief on appeal with reference to the order that denied her relief based on the theory that certain pertinent documents are

still not received by Respondent's counsel and thus the Court's determination was erroneous and unjust.

27.    Ms. Sorokin remains in custody at Orange County Correctional Facility and has been in custody now since March 25, 2021, approximately eight months in total.

## PARTIES

### A.    Petitioner

28.    Anna Sorokin, was born in Russia and she entered the USA Lawfully under ESTA as she is a citizen of Germany.  She is detained by the Respondent at Orange County Jail.

### B.    Respondents

29.    Respondents CARL E. DUBOIS, is named in his official Capacity named in his official capacity as the Sheriff of Orange County, New York. In that capacity, Sheriff Carle E. Dubois is responsible for the Orange County Jail, a detention facility under contract with Immigration and Customs Enforcement ("ICE") and the physical location where Ms. Anna Sorokin has been in custody since on or about March 25, 2021. The address for Orange County Jail is 110 Wells Farm Road, Goshen, NY 10924.

30.    Respondent TOM DECKER, is named in his official capacity as the Field Office Director for the New York Field Office for ICE within the United States

Department of Homeland Security ("DHS") for New York. In that capacity, Field

Director Decker has supervisory authority over the ICE agents responsible for

making the initial custody decision regarding Ms. Anna Sorokin.  The address for

the St. Paul Field Office is 26 Federal Plaza, New York, NY 10278.

31.     Respondent TAE JOHNSON, is sued in his capacity as the Director,

Immigration and Customs Enforcement within DHS, located in Washington, D.C.

In that capacity, Director Johnson has supervisory capacity over ICE personnel in

New York, and he is the head of the agency that retains legal custody of Ms.

Sorokin. The address for ICE Headquarters is 500 12th St. SW, Washington, D.C.

20536.

32.     Respondent ALEJANDRO MAYORKAS, is sued in his capacity as the

Secretary of the Department of Homeland Security.  In this capacity, Secretary

Mayorkas is responsible for the administration of the immigration laws pursuant to

§ 103(a) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1103(a)

(2007), routinely transacts business in the Southern District of New York,

supervises Field Director Johnson, is legally responsible for pursuing Ms.

Sorokin's detention and removal, and as such is Ms. Sorokin's legal custodian.

Secretary Mayorkas' address is U.S. Department of Homeland Security,

Washington, D.C. 20528.

33.     Respondent  MERRICK GARLAND, Attorney General of the United States, is sued in his official capacity as the Attorney General of the United States. In this capacity, he is responsible for the administration of the immigration laws as exercised by the Executive Office for Immigration Review, pursuant to 8 U.S.C. § 1103(g). He routinely transacts business in the Southern District of New York, is legally responsible for administering Ms. Sorokin's removal proceedings and the standards used in those proceedings, and as such is Ms. Sorokin's legal custodian. Attorney General Garland's address is U.S. Department of Justice, 950 Pennsylvania Ave. NW, Washington, D.C. 20530.

## **JURISDICTION**

34.     Ms. Anna Sorokin is detained in the custody of Respondents in Goshen, New York which lies in the Southern District of New York. This Court has subject matter jurisdiction over this Petition pursuant to 28 U.S.C. § 2241, 28 U.S.C § 1331, and Article I, § 9, cl. 2 of the United States Constitution; the All Writs Act, 28 U.S.C § 1651; the Administrative Procedure Act, 5 U.S.C. § 701; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

35.     Ms. Anna Sorokin's current detention as enforced by Respondents constitutes a "severe restraint on her individual liberty," such that Ms. Anna Sorokin is "in custody" in violation of the laws of the United States. See Hensley v. Municipal Court, 411 U.S. 345, 351 (1973). While the circuit courts of appeals

have jurisdiction to review removal orders directly though petitions for review, see

8 U.S.C. § 1252(a)(1), (b), the federal district courts have jurisdiction to determine

the legality of an individual's detention by ICE. See, e.g., Demore v. Kim, 538

U.S. 510, 516-17 (2003); Zadvydas v. Davis, 533 U.S. 678, 687 (2001).

## VENUE

36.     This case is properly brought in the Southern District of the State of New

York pursuant to 28 U.S.C. § 2241(d) and 28 U.S.C. § 1391(b)(2).

37.     Petitioner is detained in Goshen, New York which is located within the

Southern District, under the authority of Respondent Tom Decker and in the

physical custody of Sheriff Carl E. Dubois. Both Respondents are located within

the authority of this Court. Petitioner was subject to proceedings held at 201

Varick Street, New York, NY. Petitioner resided in the Southern District prior to

her detention.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

38.     Ms. Anna Sorokin has no administrative remedy to address the claims raised

in this Petition, and even if there were administrative remedies which could

provide relief, exhaustion would be futile.

39.     Ms. Anna Sorokin claims that her detention is unconstitutional and is being

enforced based on her conviction which is on direct appeal and thus the

Immigration Judge has jurisdiction to hear her case. Matter Of Armando Cerda

Reyes, 26 I&N Dec. 528 (BIA 2015).  The Immigration Judge has agreed with the DHS that the IJ has no jurisdiction to consider bond as Petitioner is held pursuant a visa waiver overstay. This decision has been appealed to the Board of Immigration Appeal.

40.    This initial Appeal has been denied by the Board of Immigration Appeals.

41.    It is submitted that the BIA would apply these same precedents as dispositive of Ms. Sorokin's claims and thus, although Ms. Sorokin has filed two appeals with the BIA, an administrative appeal would be futile. See Monestime v. Reilly, 704 F. Supp. 2d 453, 456-57 (S.D.N.Y. 2010).  Furthermore, Ms. Sorokin challenges her unlawful detention that has lasted over seven months and should not be required as a prudential matter to endure additional time detained while awaiting BIA review.

42.    Respondents initially allowed Petitioner to remain at liberty after her release from the New York State Department of Corrections, now Respondents have denied Petitioner's application for a stay or removal and will not release her from custody under the theory that she is a danger to the community.

43.    Ms. Sorokin has been seeking relief from the date she was taken into custody on March 25, 2021 and continues to pursue release to date.

44.    Moreover, this issue would not bar Ms. Sorokin's pursuit of the instant writ as the agency predetermined the issues here in their administrative order of

removal and Ms. Sorokin does not need to exhaust applications for relief to pursue her writ.   Garcia v. Shanahan, 615 F.Supp.2d 175, 179–80 (S.D.N.Y.2009); Rianto v. Holder, No. CV-11-0137-PHX-FJM, 2011 WL 3489613, at *3 (D. Ariz. Aug. 9, 2011) (28 U.S.C. § 2241 does not specifically require petitioners to exhaust direct appeals before seeking habeas relief); see generally Cisneros v. Napolitano, No. 13-700 (JNE/JJK), 2013 WL 3353939, at *3 (D. Minn. July 3, 2013) (addressing habeas claim without discussing administrative exhaustion).  Exhaustion is also not required if it would be futile. Pastor–Camarena v. Smith, 977 F. Supp. 1415, 1417 (W.D. Wash. 1997); Duy Tho Hy v. Gillen, 588 F.Supp.2d 122, 125–26 (D.Mass.2008) (holding that exhaustion of administrative remedies is not required "where the agency has predetermined the issue before it").

## STATEMENT OF FACTS

**Petitioner's Background**

45.    Petitioner is a white female and a native of Russia and citizen of Germany. The Petitioner does not have any children and she has never been married. Petitioner most recently came to the United States in 2017 under ESTA.

**Petitioner's Arrest and Conviction**

46.    Petitioner was arrested, detained at Riker's Island, charged, tried and convicted of the following offenses:

    a)    ATTEMPTED GRAND LARCENY IN THE FIRST DEGREE PL
        SECTION 110/155.42; AND

b)  TWO COUNTS OF GRAND LARCENY IN THE SECOND
    DEGREE
    UNDER PENAL LAW SECTION 155.40(1); AND

c)  GRAND LARCENY IN THE THIRD DEGREE UNDER PENAL
    LAW SECTION 155.35(1) AND

d)  THREE COUNTS OF THEFT OF SERVICES UNDER PENAL
    LAW SECTION 165.15(3); AND

e)  THEFT OF SERVICES UNDER PENAL LAW 165.15(2)

47.   Petitioner's Criminal Case is on Direct appeal with the Supreme Court of the

State of New York: Appellate Division First Department.

48.   The Petitioner was released from prison on February 12, 2021 and was being

supervised by the New York State Department of Parole pursuant to an order of the

Honorable Justice Kiesel sentencing her to four (4) to twelve (12) years in prison

after she was convicted at trial. On the day of her release, Petitioner was granted

supervised release by DHS and served with a Notice of Intent to issue a final order

of administrative removal.

49.   After being convicted, the Petitioner secured contracts with Netflix, RTL,

Info Network, and others to sell her story.  Justice Kiesel ordered the Defendant to

pay restitution to the judgment creditors that were named in the criminal case

against the defendant totaling approximately $200,000.00.

50.   The Petitioner was granted early release by the Board of Parole for she

displayed exceptional qualities as an inmate at Albion Correctional Facility where

she was housed for three years during her sentence. The Petitioner has paid all

restitution ordered by the Honorable Justice Kiesel.

51.     The Petitioner has a host of friends in the United States who are standing with her and providing support and assistance to Petitioner.  The Petitioner is working on a bail reform project and is actively trying to be a positive example of how the United States provides full and fair opportunities to turn one's trials and tribulations into opportunities to make a difference.

52.     Petitioner filed an application to extend her stay which was denied by USCIS.  Prior to this the Petitioner filed an I589 application because Petitioner claims to have a valid claim for asylum as she has a credible fear of returning to Germany.

**Administrative Removal**

53.     The Petitioner was served with a Visa Waiver Program Notice of Intent to Issue A Final Administrative Removal Order on February 09, 2021.

54.     The Petitioner was not detained by ICE and was allowed to remain at liberty via an order of supervision dated February 9, 2021.

55.     The Petitioner reported to ICE at 26 Federal Plaza, New York NY where she as detained on or about March 25, 2021 after agents served her with a notice of a final order of deportation based on the claim that Respondent overstayed her terms of entry pursuant to ESTA.

56.     The Visa Waiver Program Administrative Removal Order is dated February 09, 2021 but was not served until March 25, 2021.

57.     Petitioner was not given a reason as to why the Order of supervision was rescinded and why she has not been released in the subsequent months.

**Immigration Court Proceedings**

58.     Petitioner filed an I589 application and the Immigration and Customs Enforcement (ICE) served her with notice of a court date for April 6, 2021 before the Immigration Judge at 201 Varick Street, New York NY.

59.     On April 6, 2021, the Petitioner appeared in Immigration Court and requested that she be released from custody. The Immigration Court, without authority, held a bond hearing, ultimately denying the respondent bond pursuant to INA § 236(a) because she failed to establish that she is not a danger to the community. The respondent reserved her right to appeal the April 6th Order and submitted her NOA to the Board on or after April 13, 2021. By that time, however, the Immigration Court had already vacated the April 6th Order by issuing the April 8th Order after the Department submitted a motion to reconsider the decision due to lack of the court's authority.

60.     The Government further argued that the Immigration Judge properly vacated his April 6th Order because he did not have the authority to redetermine the Petitioner's custody determination. See Matter of A-W-, 25 I&N Dec. 45 (BIA 2009).

61.    Thus, the Government maintains to date that Department's detention authority with respect to the Petitioner who is removable as a VWP violator is pursuant to INA § 217(c)(2)(E); this section does not confer authority on the Attorney General to review the Department's custody determination. See INA § 217(c)(2)(E); Matter of A-W-, 25 I&N Dec. At 47.

62.    The Government stressed their claim that the authority to detain a noncitizen who is removable for violating the VWP and who seeks asylum was transferred to the Department from the Attorney General by the Homeland Security Act of 2002, Pub.L. No. 107-296, 116 Stat.235. See Matter of A-W-. 25 I&N Dec. at 47-48. Based on this delegation, the Immigration Judge lacked authority to hold a bond hearing to redetermine the Petitioner's custody status. See id. (The Immigration Court did not have authority to review the custody status of a VWP overstay who was in asylum-only proceedings).

63.    The Government argued that the Petitioner is a VWP violator and is not in removal proceedings pursuant to the filing of an arrest warrant and the issuance of a NTA and thus, the Immigration Court properly vacated its April 6th Order for lack of authority.

64.    The Government has not addressed any of the issues pertinent to the question of continued detention such as whether service of the final order of

removal was actually properly effectuated and or whether the direct appeal are dispositive.

65.    An Individual hearing was held on My 20, 2021 where the Immigration Judge ordered that a hearing on the merits of Petitioner's application would take place despite counsel's request for a continuance.

66.    The Judge Denied Petitioners application and ordered that she be removed to Germany.

67.    Petitioner has appealed this decision to the Board of Immigration appeals. The deadline to file the appropriate brief was September 8, 2021 and Respondent met that deadline and the appeal is pending decision and order.

**Petitioner's lengthy and indefinite detention**

68.    Ms. Sorokin was first detained at 26 Federal Plaza, New York NY on or about March 25, 2021 and was subsequently transported to Bergen County jail in New Jersey, then to Orange County jail in New York where she is currently detained.

69.    This detention has affected her psychological and emotional health in that she was subjected to 23 hours a day in solitary confinement having only one hour each day to leave her cell.  This affected Ms. Sorokin and cause her to have moments of non-stop crying and led to insomnia.

70.     This detention has led to a situation of stress for Ms. Sorokin which is not surprising as it is well settled that civil detention of indefinite duration can cause "severe and chronic states of stress, helplessness, hopelessness, depression, anxiety and dread." Physicians for Human Rights, Punishment Before Justice: Indefinite Detention in the US 9-10, 27-30 (2011) (available at https://s3.amazonaws.com/PHR_Reports/indefinite-detention-june2011.pdf.

71.     It is submitted that the deleterious effects of prolonged detention are magnified for those who have experienced trauma.  (Id.)

72.     Moreover, solitary confinement, which "is often used as a management tool for individuals with mental illness," has "disastrous psychological and physiological consequences," and often exacerbates mental illness. Nat'l Immigrant Justice Ctr. & Physicians for Human Rights, Invisible in Isolation: The Use of Segregation and Solitary Confinement During Immigration Detention 12-14 (2012) (available at https://s3.amazonaws.com/PHR_Reports/Invisible-in-Isolation-Sep2012-detention.pdf.

73.     It is submitted that to subject Ms. Sorokin to continued detention as the issues with COVID-19 continues to rise, is tantamount to cruel and inhuman treatment as Ms. Sorokin has not done anything to warrant the extreme steps being pursued here in furtherance of her detention.

**Planning for Petitioner's Release**

74.    It is respectfully submitted that there are less restrictive and more humane ways to further the goals of the Government.

75.    For example, Anna Sorokin has a curfew and was required to report to the Department of Probation in New York County on a weekly basis.  She was not allowed to open any bank accounts and all financial transactions she is party to are funneled through her attorney's IOLA account so that the records are readily available for inspection upon demand.  Ms. Anna Sorokin's residence is approved by the Parole Board and she has surrendered her passport to ICE.

76.    Ms. Sorokin could be released with an ankle bracelet, she could be restricted in the access she enjoys with social media or any other limitations that the Government may believe will protect the public from the threats they claim she poses.

77.    More importantly, the Government can further their goals via adherence to the stringent restrictions the Parole Board fostered for the next 10 years as the Petitioner's parole does not end for the next ten years.

78.    The Petitioner will not be a burden to the State as she has very lucrative contracts with NetFlix and other well established media groups.  Therefore, she will be self-sustaining for the entirety of her presence in the USA.

79.    She has a place to live and means of providing for herself and her business ventures will actually provide jobs for Americans.  Ms. Sorokin has already

provided for several people's financial security.  She has paid out over $75,000 in legal fees, and has hired camera men/women, videographers, photographers, and a team of American media personnel.

80.    Her bail reform venture has already called to attention several activists who are eager to work with her. Her concerns about the conditions many inmates face have not fallen on deaf ears.

81.    The Department of Corrections has actually launched an investigation into the concerns.

82.    Ms. Anna Sorokin is truly a force of change that Americans can believe in and a source of inspiration for those who have fallen to believe they can get back up again.

## LEGAL BACKGROUND

## I.    STATUTORY FRAMEWORK

83.    The statutory authority for detention during removal proceedings before a final order of removal is issued is 8 U.S.C. § 1226. Section 1226, in turn, consists of two main subsections: § 1226(a) and § 1226(c). The text of § 1226(a), the general statute authorizing detention of noncitizens, reads in pertinent part:

> (a) Arrest, detention, and release
>
> On a warrant issued by the Attorney General, an alien may be arrested and detained *pending a decision on whether the alien is to be removed from the United States*. Except as provided in subsection (c) of this section and pending such decision, the Attorney General--

(1) may continue to detain the arrested alien; and

(2) may release the alien on--

(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

(B) conditional parole

8 U.S.C. § 1226(a) (emphasis added).

84.    Section (b) then provides that "[t]he Attorney General at any time may revoke a bond or parole authorized under subsection (a) of this section, re-arrest the alien under the original warrant, and detain the alien." 8 U.S.C. § 1226(b) (emphasis added).

85.    Section (c)(1) describes a limited subset of detained noncitizens who are subject to mandatory detention, rather than the discretionary detention of section (a). It reads:

(1) Custody

The Attorney General *shall take into custody any alien* who—

(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, or

(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

> when the alien is released, without regard to whether the alien is
> released on parole, supervised release, or probation, and without
> regard to whether the alien may be arrested or imprisoned again
> for the same offense.

8 U.S.C. § 1226(c)(1) (emphasis added).

86.   Under § 1226(a), a detained noncitizen is entitled to an individualized

review of risk of flight and dangerousness to the community, in the form of a bond

hearing.

87.   However, a noncitizen detained under § 1226(c) is not entitled to any

opportunity to seek bond, and is instead mandatorily detained for the duration of

their immigration proceedings. In other words, § 1226(a) is the broad, authorizing

provision that allows for the discretionary detention of any noncitizen pending

removal proceedings on an individualized basis, and § 1226(c) sets out an

exception to the "general rule that allows bond hearings." Sylvain v. Attorney Gen.

of U.S., 714 F.3d 150, 153 (3d Cir. 2013). This exception prescribes a categorical

detention regime applicable only to a limited sub-class of detainees.

## II.   8 U.S.C. § 1226(c) DOES NOT AUTHORIZE PROLONGED MANDATORY DETENTION

88.   Ms. Anna Sorokin's detention for over seven months without a bond hearing

is an egregious violation of the Fifth Amendment's guarantee that "[n]o person

shall be . . . deprived of life, liberty, or property, without due process of law."

89.    This is especially true considering the fact that COVID-19 has taken the

lives of over 600,000 Americans to date and continues to threaten the health, safety

and well-being of everyone forced to share close quarters with countless others.

90.    Recognizing that the prolonged detention of noncitizens would raise serious

due process concerns, the four circuits that have addressed the question have all

agreed that § 1226(c) contains an implicit 'reasonableness' limit, after which

individualized review or release is required. Lora v. Shanahan, 804 F.3d 601 (2d

Cir. 2015); Rodriguez v. Robbins, 715 F.3d 1127 (9th Cir. 2013) ("Rodriguez II");

Diop v. ICE/Homeland Sec., 656 F.3d 221 (3d Cir. 2011); Ly v. Hansen, 351 F.3d

263 (6th Cir. 2003).

91.    It is submitted that the detention of a person who has already withstood the

stringent process of parole board review successfully based on a claim of

dangerousness is oxymoronic and violative of all principles of res judicata that this

court should be bound by.

92.    There is no question that seven months in COVID-19 America far exceeds

any measure of reasonableness, so Ms. Sorokin should be entitled to habeas relief.

93.    In order to determine whether no-bond detention has become unreasonable,

courts have employed either a six-month bright-line test or a multi-factor test.

Compare Lora, 804 F.3d at 614-16 (six-month bright-line test) and Rodriguez II,

715 F.3d at 1138-39 (same), with Chavez-Alvarez v. Warden York Cty. Prison,

783 F.3d 469, 473-75 (3d Cir. 2015) (multi-factor test) and Ly, 351 F.3d at 271-73 (same).

94.     As discussed below, Part B, this Court should apply the six-month bright-line test, under which a noncitizen is entitled to an automatic bond hearing after six months of § 1226(c) detention, because this test is supported by Supreme Court due process precedent, is more practical, will conserve judicial resources and the resources of the parties, and will better and more consistently protect individuals' core constitutional rights.

95.     Under this test, it is submitted that the Court's refusal to grant the bond hearing requested by Ms. Sorokin is unconstitutional.  Ms. Sorokin was due a bond hearing with constitutionally sufficient procedural protections the moment she raised the issue that no proper service of the administrative order was made and pointed out that the proof of service states Petitioner was served in Batavia NY and Petitioner was detained at Albion Correctional and thus service in Batavia would have been impossible. See Rodriguez II, 715 F.3d at 1138-39.

96.     It is submitted that even if this Court elects instead to follow a multi-factor reasonableness test, the Court should still find that Ms. Sorokin's detention has exceeded the bounds of reasonableness, and therefore due process requires a bond hearing "at which the Government bears the burden of proving that continued detention is necessary to fulfill the purposes of the detention statute," namely,

preventing flight and danger to the community. Diop, 656 F.3d at 233; see also Ly, 351 F.3d at 273 (applying the multi-factor test and placing the burden on the government to show that detention prevents flight or danger to the community).

A. **Because Prolonged Detention Under § 1226(c) Raises Due Process Concerns, § 1226(c) Must Be Construed to Authorize No-Bond Mandatory Detention for Only a 'Reasonable' Duration**

97.    The Petitioner's detention for eight months is inhumane and unnecessary as the Government can further its purpose by less punitive, more humane means.

98.    It is well established that "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." Zadvydas 533 U.S. at 690. It is "well established" that the Fifth Amendment's Due Process Clause protects detained noncitizens like Ms. Sorokin from unconstitutional deprivations of liberty when in deportation proceedings. Demore, 538 U.S. at 523 (internal citations omitted).

99.    The Supreme Court "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." Addington v. Texas, 441 U.S. 418, 425 (1979) (emphasis added).

100.   Additionally, the Court has long held that civil detention is unconstitutional absent a sufficient justification and strong procedural protections. See generally,

e.g., Zadvydas, 533 U.S. at 690; Foucha v. Louisiana, 504 U.S. 71, 80–83 (1992);

United States v. Salerno, 481 U.S. 739 (1987); Addington, 441 U.S. at 425–27,

433; Jackson v. Indiana, 406 U.S. 715 (1972).

101.   Moreover, as detention grows in length, the justification for the increasingly

severe deprivation of individual liberty must also grow stronger. See, e.g., Kansas

v. Hendricks, 521 U.S. 346, 363-64 (1997); see also Chavez-Alvarez, 783 F.3d at

474 (citing Diop, 656 F.3d at 232, 234); Casas-Castrillon v. Dep't of Homeland

Sec., 535 F.3d 942, 950 (9th Cir. 2008).

102.   The Supreme Court has applied the canon of constitutional avoidance to

preclude prolonged categorical detention without individualized review in the

context of post-removal period detention under 8 U.S.C. § 1231(a)(6). In Zadvydas

v. Davis, the Supreme Court held that post-removal period detention under §

1231(a)(6), like other "nonpunitive" civil detention, is subject to due process

limitations. 533 U.S. at 690-92, 696-700.

103.   Applying the canon of constitutional avoidance, the Supreme Court limited

detention under § 1231(a)(6) without an individualized justification to a

presumptively reasonable period of six months—the time "reasonably necessary"

to ensure removal—even though § 1231(a)(6) is silent on the length of detention it

authorizes. Id. at 689, 697-98. After the six-month period has passed, noncitizens

can demand that the government justify their continued detention on an individual

basis. Id. at 689 (explaining that courts must construe statutes to avoid constitutional concerns where "fairly possible").

104.   Like § 1231(a)(6), § 1226(c) contains no express temporal limitation on the length of mandatory detention; however, § 1226(c) detention without bond should be similarly limited to a reasonable period. The Supreme Court has never addressed whether no-bond detention under COVID-19 conditions would violate the constitution, but all of the circuit courts addressing the issue have ruled that prolonged no-bond detention under § 1226(c) raises serious due process concerns and have ordered either a bond hearing or immediate release when detention becomes prolonged.

105.   In the Second and Ninth Circuits, mandatory detention under § 1226(c) is "presumptively prolonged," and thus "'constitutionally doubtful'" when it "surpasses six months in duration." Rodriguez II, 715 F.3d at 1136-1137, 1139 (affirming an order for bond hearings for § 1226(c) detainees held longer than six months) (quoting Casas-Castrillon, 535 F.3d at 951); see also Lora, 804 F.3d at 606 n.11, 614-16 (adopting the six-month bright-line rule in use in the Ninth Circuit and affirming an order for a bond hearing for an individual detained under § 1226(c) based on the fact that he was detained for five-and-a-half months before being released on bond and "it [wa]s certain that, were he to be returned to custody, his total period of detention would exceed six months"); Rodriguez v.

Robbins, 804 F.3d 1060, 1080-81 (9th Cir. 2015) ("Rodriguez III") (reiterating the holding in Rodriguez II that individuals detained longer than six months pursuant to § 1226(c) are entitled to bond hearings).

106.   Similarly, in Diop v. ICE/Homeland Security, the Third Circuit granted habeas relief for a noncitizen held under § 1226(c) for thirty-five months. The court held that "the constitutionality of [mandatory § 1226(c) detention without a bond hearing] is a function of the length of the detention. At a certain point, continued detention becomes unreasonable and the Executive Branch's implementation of § 1226(c) becomes unconstitutional unless the Government . . . justifie[s] its actions at a hearing inquiring into whether continued detention is consistent with the law's purposes of preventing flight and dangers to the community." Diop, 656 F.3d at 232. The Third Circuit also concluded that in enacting § 1226(c), Congress "did not intend to authorize prolonged detention without . . . further inquiry into whether detention is necessary." Id. at 235 (emphasis added).

107.   Likewise, in Ly v. Hansen, the Sixth Circuit held that detainees may not be held under § 1226(c) without bond beyond the time "reasonably required to complete removal proceedings in a timely manner." 351 F.3d at 266, 268 (affirming the district court order for a bond hearing after one and one-half years of detention).

108.   The Ly court read the constitutional requirement for reasonable duration as

consistent with Congress's "clear" intent that "removal proceedings [for detained

criminal noncitizens] were to proceed quickly." Id. at 269 (citing 8 U.S.C. §

1229(d)(1), which states that "[i]n the case of an alien who is convicted of an

offense which makes the alien deportable, the Attorney General shall begin any

removal proceeding as expeditiously as possible after the date of the conviction").

109.   While the Supreme Court held in Demore v. Kim that brief mandatory

detention under § 1226(c) without a bond hearing did not violate due process, this

holding was specifically premised upon the fact that the noncitizen had been

detained for just six months, as well as evidence that, at the time, § 1226(c)

detention more broadly was neither indefinite nor prolonged. 538 U.S. at 530-31;

id. at 529–30 (relying on evidence that, at that time, removal proceedings were

completed in an average time of forty-seven days and a median time of thirty days

in 85% of cases, and that the remaining 15% of cases, in which an there is an

appeal, were completed in an average of four months). Indeed, although the

Demore Court upheld a narrow exception to the general civil detention rule that

"liberty is the norm" absent procedural protections to ensure that detention is

justified, Salerno, 481 U.S. at 755, this exception was narrowly tailored to the

relatively brief period at issue in Demore. Id. at 513, 523, 527–29; see also Lora,

804 F.3d at 614 ("[I]n Demore v. Kim, [the Supreme Court] emphasized that, for

detention under the statute to be reasonable, it must be for a brief period of time."); Ly, 351 F.3d at 276–77 (Judge Haynes, concurring in part and dissenting in part).

110.   As the crucial fifth vote in Demore, Justice Kennedy acknowledged in his concurrence that "if continued detention bec[omes] unreasonable or unjustified," a noncitizen could be "entitled to an individualized determination as to his risk of flight and dangerousness." 538 U.S. at 532 (Kennedy, J., concurring); see also id. at 532-33 ("Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons."); Lora, 804 F.3d at 614; Rodriguez II, 715 F.3d at 1137.

111.   Since Demore, "the time that each immigrant spends in detention has . . . risen substantially." Lora, 804 F.3d at 604-05. Circuit courts now rely on the six months of detention at issue in Demore as a touchstone for determining whether no-bond detention under § 1226(c) has become unreasonably prolonged. See, e.g., Rodriguez III, 804 F.3d at 1068 ("[T]he Court's holding in Demore turned on the brevity of mandatory detention under § 1226(c) . . . ."); Chavez-Alvarez, 783 F.3d at 474, 477-78 (holding that detention became unreasonable at some point between six months and one year of detention and noting that "the Court in Demore expected the detentions under section 1226(c) to be brief, and . . . this expectation

was key to their conclusion that the law complied with due process."); Rodriguez

II, 715 F.3d at 1137 ("[W]e have consistently held that Demore's holding is limited

to detentions of brief duration."); Diop, 656 F.3d at 234 (explaining that mandatory

detention becomes more constitutionally "suspect" as it extends beyond the brief

detention periods considered by the Supreme Court in Demore).

112.   This Court has agreed that imposing a reasonable time limit on § 1226(c)

detention "saves the statute from constitutional challenge." Ly, 351 F.3d at 270.

## <u>No-Bond Detention Under § 1226(c) Is Unreasonably Prolonged After Six Months</u>

113.   In determining whether § 1226(c) detention has become unreasonably

prolonged, courts in this district have overwhelmingly adopted the Sajous five-

factor approach. See. Doe v Decker No. 20 Civ 4232, Dukuray v. Decker, No. 18

Civ. 2898(VB), 2018 WL 5292130, at 3-4 (S.D.N.Y. Oct. 25, 2018)

114.   Under this test the Courts consider (1) the length of Detention; (2) whether

the Petitioner is responsible for the delay; (3) The Petitioner's Defense to

Removal; (4) Petitioner's criminal history; and (5) The difference between

Petitioner's current facility and a penal institution for criminal detention.

115.   Under this standard, "[t]he first, and most important, factor . . . is the length

of time the alien has already been detained." Sajous, 2018 WL 2357266 at 10.

Courts in this District have largely agreed that detention without an individualized

bond hearing for "longer than six months is more likely to be `unreasonable,' and

thus contrary to due process, than detention of less than six months." Sajous, 2018 WL 2357266, at *10

116.   Here Petitioner has been detained for eight months.

117.   The immigration judge recently denied bond claiming she is a danger to the community based on newspaper articles, and other media postings that the Government submitted.

118.   This is not sufficient reason to justify or warrant the prolonged detention or delays, here as the Petitioner has meritorious defenses to her removal, has a single criminal conviction and is detained in a facility identical to a Penal institution for Criminal detention.

### B.   <u>Ms. Sorokin's Mandatory Detention Has Become Unreasonably Prolonged</u>

119.   Ms. Sorokin has been detained for approximately eight months since March 25, 2021.

120.   The Court has denied her a meaningful opportunity to challenge her detention, nor has there been a determination that her continued detention is warranted based on flight risk and the determination that she is a danger is in direct contrast to the Parole Board's finding only a month prior to this determination and there was no change in circumstance that was substantial enough to justify this view that goes against the Parole Board's finding.

121.   Under the multi-factor test, Ms. Sorokin's detention has become unreasonable, and she is entitled to relief from this Court.

122.   Ms. Sorokin has been in ICE custody since March 25, 2021.

123.   Under the six-month rule, taking into account COVID-19 changes, Ms. Sorokin should be entitled to a constitutionally adequate bond hearing.  Ms. Sorokin is clearly entitled to more than just a bond hearing, where the government bears the burden of justifying her continued detention.

124.   Likewise, under the multi-factored reasonableness test, Ms. Sorokin's detention is unreasonable. The most central consideration—length of detention "beyond the average times necessary for completion of removal proceedings which were identified in Demore," Alli, 644 F. Supp. 2d at 543—weighs heavily in favor of release.  538 U.S. at 529; see also Araujo-Cortes, 35 F. Supp. 3d at 548, 550 (holding that detention under § 1226(c) became unconstitutionally unreasonable under a multi-factor test after six months of detention).

125.   Second, it is highly likely that Ms. Sorokin's removal proceedings will continue for untold months while she awaits a decision by the BIA and any subsequent appeal that becomes necessary.

126.   Unlike the petitioner in Demore, whose detention had a "definite termination point," 538 U.S. at 529, and who, according to the Demore majority, "conceded . . . to being a deportable alien for whom deportation was a real and imminent

probability," there is "no end in sight" for Ms. Sorokin. See Bourguignon, 667 F.

Supp. 2d at 182-83.

127.   Third, it is not clear that the pending immigration proceedings will ever

result in Ms. Sorokin's removal. Given the fact that she is claiming asylum, and

has been trying to extend her stay and most likely may secure relief either from

USCIS or the Court.  Flores-Powell, 677 F. Supp. 2d at 472; see also Hussain v.

Mukasey, 510 F.3d 739, 743 (7th Cir. 2007) ("It would be a considerable paradox

to confer a constitutional or quasi-constitutional right to release on a [noncitizen]

ordered removed (Zadvydas) but not on one who might have a good defense to

removal.").

128.   Fourth, any unwarranted delay in this case was caused by COVID-19 issues,

and other factors that are not in Petitioner's control. Furthermore, Ms. Sorokin has

not engaged in dilatory tactics, and she has only pursued bona fide legal challenges

to her removal. See Leslie v. Attorney Gen. of U.S., 678 F.3d 265, 271 (3d Cir.

2012) (quoting Oyedeji, 332 F. Supp. 2d at 753 (rejecting the government's

argument that the noncitizen's voluntary pursuit of bona fide legal challenges to

removal renders the corresponding increase in time of detention reasonable

because otherwise, the noncitizen would be "effectively punish[ed] for pursuing

applicable legal remedies."). Therefore, this factor weighs in favor of her release.

129.   This Court must construe § 1226(c) to only authorize detention of a

reasonable duration.

130.   Because in light of COVID-19 concerns, under either the six-month

presumption or the multi-factor test, Ms. Sorokin's detention has become

unreasonably prolonged, she is entitled to relief.

### C.   Because § 1226(c) Cannot Authorize Further No-Bond Detention, Ms. Sorokin Is Entitled to a Constitutionally Adequate Bond Hearing

131.   The courts have authority to fashion habeas relief as the equities require.

Schlup v. Delo, 513 U.S. 298, 319 (1995); see also Flores-Powell, 677 F. Supp. 2d

at 474.

132.   Given the prolonged nature of her detention, Ms. Sorokin requests that this

Court order a constitutionally adequate bond hearing, at which the government

bears the burden of proving, by clear and convincing evidence, that Ms. Sorokin

would pose a flight risk or a danger to the community, even under supervised

release. See Rodriguez III, 804 F.3d at 1086-89 (affirming district court order of

bond hearings after six months of detention, and periodic bond hearings every six

months after that, in which immigration judges must consider alternatives to

detention and the length of past detention thus far, with the burden on the

government to prove dangerousness or flight risk by clear and convincing

evidence); see also Diop, 656 F.3d at 235 (squarely placing the burden of proving that continued detention is justified on the government).

### III.   BECAUSE MS. SOROKIN HAS A SUBSTANTIAL CHALLENGE TO REMOVABILITY, HER MANDATORY DETENTION VIOLATES THE DUE PROCESS CLAUSE

133.   It is submitted that placing a person who has already been determined to pose no threat to the community and who is not proven to be a flight risk in mandatory detention violates her due process rights because, unlike the detained noncitizen in Demore who conceded removability, Ms. Sorokin has substantial challenges to all alleged grounds of removability. See 538 U.S. at 513-14.

134.   In Demore, Justices expressed concern that detaining noncitizens with substantial claims against removability violates due process. See Demore, 538 U.S. at 532 (Kennedy, J., concurring); id. at 577 (Breyer, J., concurring in part and dissenting in part); id. at 561 (Souter, J., dissenting) ("Some individual aliens covered by § 1226(c) have meritorious challenges to removability or claims for relief from removal. . . . As to such aliens, as with Zadvydas . . . the Government has only a weak reason under the immigration laws for detaining them.").

135.   Several federal courts agree that "when a detainee who has a good-faith challenge to his deportability is mandatorily detained under § 1226(c)," his due process rights can be violated. Gonzalez v. O'Connell, 355 F.3d 1010, 1019-21 (7th Cir. 2004); see also Lora, 804 F.3d at 616 (noting, in a decision affirming a

district court grant of habeas relief after prolonged detention under § 1226(c), that the petitioner was "an excellent candidate for cancellation of removal" and therefore he was a good candidate for bond); Papazoglou v. Napolitano, No. 1:12-cv-00892, 2012 WL 1570778, at *5 (N.D. Ill. May 3, 2012) (holding that a noncitizen's due process rights were violated when he was "mandatorily detained despite the fact that he ha[d] demonstrated substantial likelihood that he w[ould] be allowed to remain in the United States and w[ould] be released from custody"); Bourguignon, 667 F. Supp. 2d at 183 & n.10 (granting habeas relief in part because, unlike in Demore, the noncitizen in Bourguignon "vigorously contest[ed] the issue of his deportability," arguing he was eligible for deferral of removal under CAT); see generally Rodriguez III, 804 F.3d at 1072 (noting that "[n]on-citizens who vigorously pursue claims for relief from removal face substantially longer detention periods than those who concede removability" and that individuals "who persevere through this lengthy process are often successful").

136.   In Ms. Sorokin's case, the BIA has not reached any decision on her appeals, the Parole Board released her early finding that she is not a threat or a flight risk and she has been mandated to abide by the terms of her supervised release or face re-arrest and imprisonment for the next ten years. It is submitted that applying mandatory detention in his case violates due process because "the ultimate purpose behind [§ 1226(c)] detention is premised upon the alien's deportability," and there

is a reasonable likelihood that he will never be deported. Demore, 538 U.S. at 531

(Kennedy, J., concurring).

### *The New York Metropolitan Area is an Epicenter of the Global Pandemic*

137.   On March 13, 2020, former President Trump declared a national emergency

in response to the coronavirus pandemic. At the time, there were over 1,600

confirmed cases in the United States and at least 46 deaths. Today, over a year

later, there are more than 600,000 COVID related deaths and although the City

recently re-opened, a new Delta Strain threatens future closings.

138.   There has been an exponential growth in the outbreak has caused more death

and health concerns than we could have ever imagined. The New York

metropolitan area is now the epicenter of the COVID-19 in the United States with.

Because the coronavirus that causes COVID-19 is particularly contagious,

authorities are took unprecedented precautions to manage the public health crisis

and minimize the transmission of the virus by reducing the opportunity for large

groups of people to congregate. Former Governor Andrew Cuomo of New York

ordered all non-essential workers to stay home; New York and New Jersey banned

all gatherings of more than 50 people; and New York City closed all schools, bars

and restaurants.

### *The Heightened Risk of Severe Illness or Death from COVID-19 in Jails*

139.   Incarcerated persons have limited ability to take the precautionary steps that public health experts recommend. Jail design and operations make it impossible for the plaintiffs to engage in necessary social distancing, and they have no control over the movements of others with whom they live in close proximity and share spaces and resources.

140.   According to infectious disease specialist Dr. Ranit Mishori, jails, prisons, and detention centers are settings that pose a "significantly higher" risk for the spread of infectious diseases like COVID-19 than the general community. In China, where the pandemic began, coronavirus suddenly exploded in prisons in early March, with 500 cases identified in five different facilities. Jails that hold pre-trial detainees, like the ones where Plaintiffs are currently detained by ICE, are a particularly high risk setting for contagion because of their large turnover of detainees on a daily basis.

141.   The highest known person-to-person transmission rate for COVID-19 to date has taken place in settings where people are in close proximity to each other without an ability to distance themselves: in a skilled nursing home facility in Kirkland, Washington, and on cruise ships in Japan and off the coast of California.

142.   The conditions of jails such as those utilized by ICE in the New York area pose an even higher risk of the spread of COVID-19 than non-carceral locations like a nursing home or cruise ship due to their closer quarters, the proportion of

vulnerable people detained, and lack of medical care resources.  Even when family

or in-person legal visitation to jails is sharply curtailed, it is impossible to seal

entry and exit for staff, contractors, and vendors. Detainees within such facilities

thus cannot be isolated from viruses circulating in the broader community.

Preventative strategies utilized by the general public, like social distancing, hand

sanitizing, and proper ventilation are neither readily available nor particularly

effective.

143.   As a result, rapid transmission and widespread outbreak is virtually

inevitable.

144.   Once an infectious disease like COVID-19 enters a facility, there is

frequently insufficient protective gear for staff and detainees, who live in close

quarters and share common spaces and resources. When an outbreak occurs, jails

are ill-equipped to engage in adequate containment and proper medical treatment

for sick detainees. Medical experts agree that reducing the number of detainees is a

necessary component of risk mitigation in a pandemic as widespread and serious as

the one currently spreading across the United States. "Not doing so is not only

inadvisable but also reckless given the public health realities we now face in the

United States."

145.   Any reduction in detained populations must focus on the most vulnerable detainees, in order to safeguard their health and the health of other detainees and jail staff.

146.   As medical staff and resources within the facility becomes overwhelmed, regional hospitals and health centers end up bearing the brunt of providing healthcare for sick detainees—who are disproportionately likely to be those with pre-existing medical vulnerabilities. The rapid spread of an infectious disease like COVID-19 within a jail ultimately results in adverse public health outcomes for the broader community and region.

147.   As a result, reducing prison populations does not just benefit detainees and correctional staff, it also benefits the community as a whole by reducing the burden on healthcare resources that are already in high demand. In the face of the current crisis, correctional systems around the country and the world, including New York City, have announced efforts to reduce their detained populations. Many of these jurisdictions are focusing their release efforts on individuals classified as high-risk. These jurisdictions include Los Angeles County, CA, Cook County, IL, a county in Ohio, Hennepin County, MN, and San Francisco, CA. 37. Despite the consensus in the medical community about the need to reduce population size to improve outcomes for public health and safety, and in sharp contrast to the efforts of jurisdictions around the United States to comply with such recommendations, ICE

recently announced that it has no plans to release individuals as a COVID-19 risk mitigation strategy.

148.   The Risks to Plaintiffs' Health are Particularly Acute in the Jails Where ICE is Detaining Them.

149.   The New York-area jails where the plaintiffs are detained—Bergen County Jail, Hudson County Correctional Facility, Essex County Jail, and Orange County Jail—are especially vulnerable to rapid transmission of COVID-19 because of the unsanitary and hazardous conditions within the facilities and their history of providing poor treatment. As a result, the irreparable harm Plaintiffs will suffer once the virus reaches them is imminent.

150.   The Bergen County Jail reported that a staff member had tested positive for COVID-19. There were also a confirmed case of a staff member in the medical unit contracting COVID-19 in at the Elizabeth Detention Center, another ICE detention facility in New Jersey. And other non-immigration facilities in the New York area, including Rikers Island, are reporting confirmed COVID-19 cases among both staff and detainees.

151.   ICE detainees at all four jails have also reported that conditions have deteriorated in recent days as the facilities take ad hoc, medically inadvisable and insufficient measures to try to contain the likelihood of transmission, including by

widespread and arbitrary use of solitary confinement at Hudson, Orange and Bergen County Jails.

152.   Detainees currently held at the facilities also describe insufficient hand soap, no hand sanitizer, and no access to cleaning supplies, and previously reported at times being deprived of toilet paper. Some detainees also report that jail officials have forbidden them from flushing toilets frequently, which adds to unsanitary conditions.

153.   Attorneys who recently visited the jails confirmed that there was a lack of hand soap in the visitors' bathrooms, meaning that visitors would carry in whatever germs they entered the facility with.  Further contributing to the elevated risk of harm is these jails' track record of failure to provide adequate and prompt medical care even before the current pandemic.

154.   Examples of inadequate care at these specific facilities includes a history of denial of vital medical treatment such as dialysis and blood transfusions; subjecting detainees in need of surgeries to unconscionable delays; altering established treatment regimens; failing to provide necessary mental health services; overuse of solitary confinement; and ignoring repeated requests for care from detainees with serious symptoms.

155.   These deficiencies in medical treatment have placed individuals at risk of strokes, heart attacks, renal failure, amputation, life-threatening heart conditions,

kidney failure, and blindness. Last year, a mumps outbreak at Bergen County Jail resulted in the quarantine of dozens of immigration detainees for several weeks.

156.   The Department of Homeland Security's own Office of the Inspector General also recently reported on the substandard care, long waits for medical care and hygiene products, and mistreatment in ICE detention facilities.

157.   In light of their failure to provide consistent access to basic hygiene and adequate health care even under normal circumstances, it appears unlikely that ICE's New York City-area jails will be able to competently and safely respond to the COVID-19 pandemic.

158.   The COVID-19 Pandemic Presents a Grave Risk of Harm, Including Serious Illness and Death to the Elderly and Those with Certain Medical Conditions COVID-19 can lead to respiratory failure, kidney failure, and death. Older patients and those with chronic underlying conditions are at a particularly high risk for severe cases and complications.

159.   Underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age include blood disorders, chronic kidney or liver disease, immunosuppression, endocrine disorders (including diabetes), metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy. The need for

intensive care and the likelihood of death is much higher from COVID-19 than from influenza.

160.   Complications from COVID-19, including severe damage to lungs, heart, liver, or other organs, can manifest at an alarming pace and serious deterioration can occur in a matter of days. According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza.

161.   Preliminary data from China showed serious illness, sometimes resulting in death, occurs in up to 16% of cases, with a higher rate among those older and high-risk individuals.

162.   Those in high-risk categories who do not die may have prolonged serious illness requiring hospital care, including ventilators that will likely be in very short supply, and a team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. Patients who do not die from serious cases of COVID-19 may face prolonged recovery, including rehabilitation from neurological damage and loss of respiratory capacity.

*__Petitioner Is At Heightened Risk Of Infection__*

163.   The psychological trauma associated with being imprisoned indefinitely is heightened when you take into account the uncertainty of not knowing whether you will contract COVID-19 and die while detained.

164.   Upon being detained, Petitioner was served with a notice that she is at heightened risk of death from COVD-19 infection.

165.   She was not given any psychological counseling and she was provided no explanation for this finding.   Instead, she was placed in solitary confinement "for her safety" for weeks and was only allowed to leave her cell for one hour a day.

166.   The Government failed to consider this classification and the Court never incorporated this into their assessment.

167.   In light of this it is submitted that the continued detention of Ms. Anna Sorokin poses an unconstitutional threat to her health safety and well-being and thus the relief prayed for here is warranted.

## IV.   **THE PETITIONER'S EVIDENCE WAS SUFFICIENT**

168.   The Petitioner presented documentary evidence in the form of her criminal court documents, NetFlix Contract, and Parole Board Documents.

169.   During the Bond Hearing that was held on October 7, 2021 before the Immigration Court, the Petitioner did not call any witnesses as she met her burden and the Government was charged with the duty of establishing facts and evidence sufficient to rebut the Petitioner's claims.

170.   The Petitioner testified credibly on her own behalf.

## V.   **THE GOVERNMENT'S EVIDENCE**

171.   The Government did not call any witnesses.

172.   Instead, the government downloaded several articles from the internet that were published by various media outlets and presented those articles in support of their arguments that the Respondent is a danger to the community.

173.   The Government made reference to a statement that Anna is alleged to have made, namely, "my rap sheet is bigger than yall dicks" in support of their claim that Anna is a threat to society.

174.   The Government did not present any direct evidence of any actions or omissions that Anna committed since being released other than the fact that Anna used social media extensively and made curt and crass statements during some of her post.

175.   The Judge repeated the quote "my rap sheet is bigger than yall dicks" during his decision as a means of justifying his findings that the Government met their burden of showing that Anna is a danger to the community.

176.   It is submitted that being accused of being a foul mouthed miscreant is not sufficient to solidify a finding of danger.

## VI.   <u>THE IMMIGRATION JUDGE ABUSED HIS DISCRETION AND VIOLATED JUDGE FURMAN'S ORDER</u>

177.   It is submitted that the Government did not meet its burden.

178.   It would have been judicious for the Immigration Judge to require that the Department of Homeland Security to comport with the goals of the Sentencing Guidelines that recommend that "family ties and responsibilities are not ordinarily

relevant in determining whether a departure may be warranted but afford for certain considerations nonetheless to balance the scales of justice.  U.S.S.G. § 5Hl.6.

179.   This statement is consistent with the Second Circuit's finding that "if the circumstances related to those factors are extraordinary, a sentencing court is not precluded as a matter of law from considering them in making a downward departure." United States v. Alba , 933 F.2d 1117, 1122 (2d Cir. 1991).

180.   Ms. Sorokin has several strong ties to the United States.

181.   She will be in serious breach of the contracts she has with NetFlix, HBO and others if she isn't afforded the privilege of remaining here to finalize the work she is under contract to finalize.

182.   Moreover, Ms. Sorokin's lawyer is in the United States and she needs to consult with her attorney frequently and to comport with Parole and so much more that removal immediately would compromise.

183.   Considering the sentence was amended by the parole board and the NYS Parole will be monitoring Ms. Sorokin on a weekly basis, and the miraculous changes she made despite all she faced and the endeavors she implemented knowing all she faced, Ms. Sorokin, presents as a prime candidate for an exercise of discretion as a result of cultural assimilation and other factors pertinent to her particular case.

## The Issue Of Danger Is Res Judicata

184.   It is respectfully submitted that the question of whether the Respondent is a danger to society and the community she lives in has already been resolved by the New York State Parole board and the Government has not shown any substantial change in circumstance that warrant the drastic outcome that is at issue here.

185.   It is submitted that with reference to the question of whether Anna Sorokin is a threat or danger to the People of the State of New York, merely by her presence in the community where she resides should trigger the application of the laws of the State of New York.

186.   The New York State's highest court, the Court of Appeals, was clear and unambiguous when it held in Matter of Hunter, 4 NY3d 260 (2005):

> "Under the doctrine of res judicata, a party may not litigate a claim where a judgment on the merits exists from a prior action between the same parties involving the same subject matter. The rule applies not only to claims actually litigated but also to claims that could have been raised in the prior litigation. The rationale underlying this principle is that a party who has been given a full and fair opportunity to litigate a claim should not be allowed to do so again (see O'Connell v Corcoran, 1 NY3d 179, 184-185 [2003]; Gramatan Home Invs. Corp. v Lopez, 46 NY2d 481, 485 [1979]). Additionally, under New York's transactional analysis

approach to res judicata, "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy" (O'Brien v City of Syracuse, 54 NY2d 353, 357 [1981], citing Matter of Reilly v Reid, 45 NY2d 24, 29-30 [1978]). "Res judicata is designed to provide finality in the resolution of disputes," recognizing that "[c]onsiderations of judicial economy as well as fairness to the parties mandate, at some point, an end to litigation" (Reilly, 45 NY2d at 28).

187.   In this case it is submitted that the parties were the same and the object of the litigation was the same, namely the Board of Parole considered whether the Ms. Sorokin was a danger to society and found she was not.

188.   This consideration involved the Government because there was an immigration detainer and the parole hearing was open to the general public and all governmental agencies that had an interest in the outcome of the parole hearing were on notice of the hearing and the implications of its outcome.

189.   The Government had a detainer on Ms. Sorokin that was honored by Albion Correctional facility, in that, the Ms. Sorokin was served with the detainer form ICE served on the jail and was informed that absent ICE's consent and acquiescence, she would not be released even though she was granted parole.

190.   The Government later served notice that Ms. Sorokin would not be detained and therefore, Albion correctional facility released the Respondent to the Department of parole.

191.   It is submitted that even a cursory examination of the facts pertinent to this matter makes it clear that the Government cannot meet their burden of proof here and this case is barred by res judicata.

192.   The basis of this statement is that the Government has not set forth any facts that support a finding that there has been a change in circumstance that is sufficient to warrant redetermination of the finding that the Respondent is not a threat to society or a danger to any community.

193.   The Government failed to oppose Ms. Sorokin's application for a grant of early parole based on the finding that she had been sufficiently rehabilitated and was not a threat to society or a danger to her community.

194.   The Government consented to Ms. Sorokin's release and lifted their detainer, which confirms that the Government upon and through March 25, 2021 did not deem Ms. Sorokin a threat to society or a danger to her community.

195.   The Government has not and cannot allege any change in circumstance that warrant a finding that the Ms. Sorokin is now a threat to society or a danger to the community and should now be barred from reconsidering their position simply

because of the extensive media coverage that followed Ms. Sorokin's release, by res judicata as interpreted by the Court of Appeals in Hunter.  Id.

196.   Therefore, it is respectfully submitted that this Honorable Immigration Court abused its discretionary power when it denied Ms. Sorokin's application for bail on a finding that the Ms. Sorokin is a threat to society.

197.   This is because the redetermination is barred by the doctrine of res judicata, as there are no changes in circumstances.

198.   Therefore, there was no need for the Court to reach the question of danger or threat absent a showing by the Government that there was a substantial change in circumstance that warranted reconsideration.

### The Bail Should Be Set Consistent With
### The Respondent's Ability To Pay

199.   Ms. Sorokin currently has $0.00 in her attorney escrow account.

200.   She has future earnings that will be realized if and only if she is released on bond and can fulfill the terms and conditions of the contracts she has entered into.

201.   It is submitted that the Court should set a reasonable Bond consistent with Ms. Sorokin's ability to pay said bond.

202.   In this instance it is submitted that the fact that Ms. Sorokin has no money in her account then the Court should consider alternatives such as an ankle bracelet etc, as Ms. Sorokin can afford to immediately meet that requirement and therefore

her continued detention based on her inability to pay the bond set by the court would be avoided.

203.   Ms. Sorokin is not a flight risk

204.   There is no question that this Honorable Court can consider whether Ms. Sorokin is a flight risk in determining whether to set bond.

205.   Ms. Sorokin is not a flight risk as she has sufficient safeguards in place to ensure she cannot abscond once released.

206.   Immediately upon being released from ICE custody, Ms. Sorokin will be required to report to the Department of parole where she will be monitored on a weekly basis.

207.   The Government can also require Ms. Sorokin to wear an ankle monitor as part of the release from custody.

208.   Basically, there are sufficient safeguards that are in place and that can be set to ensure that Ms. Sorokin does not flee and will remain available to answer and submit to any future directives or rulings.

209.   Ms. Sorokin is not a flight risk.

210.   Ms. Sorokin could have absconded when she was released from Albion Correctional Facility in February 2021.

211.   Instead, she complied with every directive and reported to parole.

212.   Ms. Sorokin could have absconded when ICE directed her to turn herself in on March 25, 2021.

213.   Instead, she appeared as directed.

214.   This proves that she has no intention to flee.

215.   There is no bench warrant history attached to her criminal file.

216.   In one instance prior to being arrested, and detained Ms. Sorokin was admitted to a rehabilitation facility and thus failed to appear in court.

217.   That situation was resolved and the warrant was vacated.

218.   Ms. Sorokin has also reported to parole as directed and adhered to her curfew faithfully after being released from custody.

219.   Ms. Sorokin's ties to the community have been verified and cleared by the New York State Department of Parole and she is actively being monitored by parole on a weekly basis and will be for the next 10 years.

220.   However, the most compelling evidence that Ms. Sorokin is not a flight risk is her conditions of release and the extensive investigation that went into the department of parole's investigation before her release from Albion.

221.   This is a strong indication that Ms. Sorokin would comply with the directives of this court if released.

222.   More importantly, Ms. Sorokin knew that she would most likely be detained when she reported to 26 Federal Plaza on March 25, 2021 and despite her knowledge she voluntarily surrendered to ICE and on March 25, 2021.

223.   It is submitted that based on the foregoing, the Government cannot meet their burden of proof here as the "clear and convincing" evidence standard adopted by the Second Circuit was taken directly from the Ninth Circuit, which has placed the same evidentiary standard on the government in similar bond hearings. See Rodriguez, 715 F.3d at 1131; see also Singh v. Holder, 638 F.3d 1196, 1200 (9th Cir. 2011) ("We also hold that, given the substantial liberty interests at stake [at prolonged detention] hearings, the government must prove by clear and convincing evidence that continued detention is justified.").

224.   The Ninth Circuit adopted this principle based on Supreme Court decisions that repeatedly required, pursuant to due process, a heightened burden of proof on the State in civil proceedings where the individual's interest at stake was both particularly important and more substantial than the loss of money. See Singh, 638 F.3d at 1204 (citing Cooper v. Oklahoma, 517 U.S. 348, 363 (1996)).

225.   As the Ninth Circuit noted that the risk of an erroneous deprivation of liberty requires that a high burden be placed on the government to justify on-going civil detention. Id. at 1204 (citing Tijani v. Willis, 430 F.3d 1241, 1244 (9th Cir. 2005)

(Tashima, J., concurring) (discussing the role of burden standards in protecting against erroneous deprivations of liberty)).

226.   The "clear and convincing" evidence standard is a higher evidentiary standard than the preponderance of the evidence standard, the latter of which only requires a showing that something is more likely than not to be true. Black's Law Dictionary (10th ed. 2014) (defining "clear and convincing" standard as being "highly probable" or "reasonably certain"); see also Colorado v. New Mexico, 467 U.S. 310, 314 (1984) (to meet the clear and convincing evidence standard, the evidence presented must "place in the ultimate fact finder an abiding conviction that the truth of the factual contentions is highly probable" (internal citations omitted)).

227.   The standard the Court must apply here also requires more than a showing of reasonable, substantial, and probative evidence. See Woodby v. INS, 385 U.S. 276, 287 (1966) (Clark, J., dissenting on other grounds) (calling the "clear, 6 unequivocal, and convincing" standard of proof placed on the government in deportation proceedings a higher standard of proof than the "long-established 'reasonable, substantial, and probative' burden"); cf. 8 U.S.C. § 1229a(c)(3)(A) (specifying that "clear and convincing" evidence for establishing that a noncitizen is deportable and also requiring that the immigration judge's decisions be based on "reasonable, substantial, and probative evidence.").

228.   Therefore, it is humbly and respectfully submitted that the Court should remand this case for the Immigration Judge to issue an order consistent with the law, and for such and further relief as this Court deems just and appropriate.

229.   The facts that are alleged by the Government to render Ms. Sorokin subject to mandatory detention, is trumped by the fact that Ms. Sorokin's conviction is on direct appeal and therefore her conviction and sentence is not final and thus pending the outcome of the direct appeal, Ms. Sorokin should not be made to remain in custody.

230.   It is humbly and respectfully submitted that considering the above the government had the burden to show that it is "highly probable" or "reasonably certain" that Ms. Sorokin would be a flight risk or danger to the community if released and they did not meet that burden.

231.   Here, it is clear from the evidence submitted by Ms. Sorokin that Ms. Sorokin is not a flight risk and the Government's burden cannot be met and therefore, bail was warranted.   Lora, 2015 WL 6499951, at 12.

232.   More importantly, "danger" is not a generalized concept, rather, it refers to an "identifiable and articulable threat to an individual or the community." See United States v. Salerno, 481 U.S. 739, 751 (1987).

233. Thus, it is humbly submitted that the mere fact that Ms. Sorokin has a serious felony conviction and is alleged to be a foul-mouthed miscreant is not sufficient to meet the government's burden in this instance or any instance.

234. The evidence of Ms. Sorokin's convictions works in her favor as it is clear that she has never absconded, and has complied with every directive set by the Court even when she was fully aware that she would be sentenced, detained or otherwise subjected to negative implications such as a term of imprisonment.

235. It is humbly submitted that because everyone detained pursuant to 8 U.S.C. § 1226(c) has by definition at least one prior qualifying offense, any court addressing this issue should necessarily anticipate that an individual's criminal history alone would not always justify the continued detention and therefore, this Court should only consider the Ms. Sorokin's past criminal record to the extent it is indicative of future dangerousness. See Singh, 638 F.3d at 1205 (observing that "the recency and severity of the offenses must be considered" and that even a lengthy record of prior convictions, including some past violent convictions, may not meet the standard for clear and convincing evidence of "future dangerousness" where the "impetus for his previous offenses[ ] has ceased."); see also Chi Thon Ngo v. INS, 192 F.3d 390, 398 (3d Cir. 1999) ("[P]resenting danger to the community at one point by committing crime does not place them forever beyond the Court's discretion.)

236.    More importantly, the Immigration Judge failed to consider the fact that Ms.

Sorokin while detained, did not sustain a single infraction and was sufficiently

rehabilitated to warrant discretion such that the department of parole granted her

application for early release.

237.    It is clear that the amount of time that has passed since the conviction and/or

evidence of rehabilitation may undercut a criminal record that would otherwise be

indicative of future dangerousness. See Singh, 638 F.3d at 1205 (discussing

evidence of changed circumstances following past convictions); Chi Thon Ngo,

192 F.3d at 398 ("Due process is not satisfied, however, by rubberstamp denials

based on temporally distant offenses.

238.    The process due even to excludable aliens requires an opportunity for an

evaluation of the individual's current threat to the community and his risk of

flight."); Rodriguez v. Shanahan, 84 F. Supp. 3d 251, 263 (S.D.N.Y. 2015) ("'[I]t

stands to reason that the more remote in time a conviction becomes and the more

time after a conviction an individual spends in a community, the lower his bail risk

is likely to be.'" (quoting Saysana v. Gillen, 590 F.3d 7, 17–18 (1st Cir. 2009));

Martinez-Done v. McConnell, 56 F. Supp. 3d 535, 546 (S.D.N.Y. 2014) ("As far

as dangerousness is concerned, there is often very little evidence that a removable

alien ever was dangerous, much less that he continues, years after release and

reincorporation into the community, to threaten society."

239.   It is humbly submitted that the Government has not and will not be able to submit a scintilla of proof that establishes or warrants a finding of clear and convincing evidence of future flight risk or danger to the community.

240.   It is well established that to meet their burden, the Government must show that Ms. Sorokin is highly probable or reasonably certain to flee if released. See Singh, 638 F.3d at 1205 (holding that even the fact that a noncitizen detainee had "already been ordered removed by a final, administrative order, diminishing the incentive to appear for further removal proceedings" was a fact "common to all detainees" seeking prolonged detention bond hearings after a final order and "alone does not constitute clear and convincing evidence that [the noncitizen] presented a flight risk justifying denial of bond" (emphasis in original)).

241.   More importantly, where individualized evidence of past flight risk may exist, current evidence of length of residency in the U.S., family and community ties, a place to reside upon release, job or family commitments upon release, and possible relief from and/or defenses to deportation would undercut that evidence as well. See Lora, 2015 WL 6499951, at 1 (noting that factors such as "strong family and community ties" and "meritorious defenses to deportation" as factors establishing the need for release on bond); see also Chi Thon Ngo, 192 F.3d at 398 ("The fact that some aliens posed a risk of flight in the past does not mean they will forever fall into that category.").

242.   In addition, under the clear and convincing evidence standard, the government should not be deemed to have met its burden based on documents that are inherently suspect or prone to error. Cf. James v. Mukasey, 522 F.3d 250, 257 (2d Cir. 2008) (criticizing the use of charging instruments as conclusive proof of a crime); Francis v. Gonzales, 442 F.3d 131, 141 (2d Cir. 2006) (discussing the problems of reliability and bias when relying on rap sheets and reports from "agencies whose jobs are to seek to detect and prosecute crimes"); Dickson v. Ashcroft, 346 F.3d 44, 55 (2d Cir. 2003) (holding that "factual narratives" in a pre-sentencing report cannot be used to determine the basis for a noncitizen's removability).

243.   Neither should the government be relying on testimony from Ms. Sorokin to meet its burden of proof.  See Matter of Guevara, 20 I&N Dec. 238, 244 (BIA 1991) ("The legal concept of a 'burden of proof' requires that the party upon whom the burden rests carry such burden by presenting evidence. If the only evidence necessary to satisfy this burden were the silence of the other party, then for all practical purposes, the burden would actually fall upon the silent party 8 from the outset."); see also Matter of Tang, 13 I&N Dec. 691, 692 (BIA 1971) (holding that the government could not meet its burden to prove a noncitizen's alienage by having the respondent testify).

244.   Ms. Sorokin's evidence and the facts pertinent to this case warranted, an

exercise of discretion by the Immigration Judge because she has all of the equities

for consideration and the Government did not produce any credible evidence that

rebut this contention.

245.   Ms. Sorokin's ties to the community are well established, Ms. Sorokin was

released to an address cleared by the mandates of her New York State Parole, she

will be gainfully employed once released as she is in contracts that are quite

lucrative and continuous, and her bond will come with the condition that she also

adheres to the mandates already imposed by the department of parole.

246.   It is humbly submitted that Ms. Sorokin should have been granted a bail

pending resolution of the proceedings now pending in Immigration Court and or at

the BIA.

247.   The failure of the Immigration Judge to recognize this fact and his decision

to again deny bond based on his Honor's review of articles from media outlets

without more, warrants this Court's remand and reversal.

248.   Based on the foregoing, it is submitted that Ms. Sorokin is not a flight risk or

a danger to any community and the Government's failure to meet their burden

warrants this Court's attention.

249.   Ms. Sorokin Should Be Granted Bond or Alternate Release

250.   It is respectfully submitted that there is no question that the Immigration

Judge can hear and determine this bond application.

251.   Justice Furman's order dated September 27, 2021 is conclusive on this issue.

252.   As previously stated, Ms. Sorokin has a felony conviction that led to her

serving jail time, she is entitled to a bond because she is not a flight risk, has a

viable claim for asylum, has now been detained for eight (8) months, and poses no

threat to the community as she will be on parole for the next ten (10) years and will

be monitored by the Department of Parole for the State of New York for the

entirety of her release from custody.  Matter of Urena, 25 I&N Dec. 140, 141 (BIA

2009) (clarifying that an immigration judge may not release a person on bond who

has not met his burden of demonstrating that his "release would not pose a danger

to property or persons"); See also 8 CFR §§ 236.1(c)(8), 1236.1(c)(8); 22 Matter of

Guerra, 24 I&N Dec. 37 (BIA 2006). 23 Matter of D-J-, 23 I&N Dec. 572 (AG

2003) (Attorney General's discretion to detain not limited to danger and flight risk;

justifying detention of Haitian asylum seekers based on the government's asserted

national security interest in deterring mass migration of Haitians by boat); Matter

of Khalifah, 21 I&N Dec. 107 (BIA 1995) (deeming person a terrorist where

person facing serious criminal charges in another country in a proceeding whose

fairness is in doubt).

253.   The Immigration Judge's determination that Ms. Sorokin is a danger to the community is not supported by the evidence that was before the Court.

254.   In light of the foregoing, the matter should be addressed accordingly.

255.   Ms. Sorokin has now been detained for eight months.

256.   It is well settled that 8 U.S.C. § 1226(a) authorizes discretionary detention of all aliens during their removal proceedings. Contant v. Holder, 352 F. App'x 692, 694 (3d Cir. 2009).

257.   Aliens detained under Section 1226(a) may be released if they demonstrate they are not a danger to persons or property and they are likely to appear for future removal proceedings. Id. at 695 (citing 8 C.F.R. § 236.1(c)(8)). Such aliens may request a bond redetermination hearing before an IJ, pursuant to 8 C.F.R. § 236.1(c)(8).

258.   An IJ may grant the request for bond redetermination if the alien's circumstances have materially changed since the prior bond redetermination. Id. (citing 8 C.F.R. § 1003.19(e)).

259.   Furthermore, the alien may appeal the IJ's bond decision to the BIA. Id. at 696  (citing 8 C.F.R. § 236.1(d)(3)).

260.   It is well established that 8 U.S.C. § 1226(c)(1) mandates that the Government "take into custody" aliens who are convicted of certain crimes or have engaged in certain terrorist activities.

261.   Detention without the possibility of bond "for a reasonable period of time" pursuant to § 1226(c) is constitutional. Diop v. ICE/Homeland Sec., 656 F.3d 221, 223 (3d Cir. 2011).

262.   Section 1226(c) detention may raise constitutional concerns if detention becomes unreasonably prolonged. Id.

263.   Pursuant to Diop, the reasonableness of a period of detention is "a function of whether it is necessary to fulfill the purpose of the statute." Id. at 234.

264.   Once detention becomes unreasonably prolonged, "the authorities must make an individualized inquiry into whether detention is still necessary to fulfill the statute's purposes of ensuring that an alien attends removal proceedings and that his release will not pose a danger to the community." Id. at 231.

265.   It is submitted that the detention here is unreasonably prolonged as Ms. Sorokin's criminal conviction is on direct appeal and the fact that she is alleged to have made posts that goes against the social norms and mores the Government deems appropriate, without more is insufficient to justify subjecting Ms. Sorokin to the social isolation and confinement she has been subjected to while in jail.

266.   Ms. Sorokin was in solitary confinement because she was attacked by another inmate that called her "Hitler" among other heinous allegations.

267.   Ms. Sorokin is readily identifiable and has been targeted as one who "thinks she is the ruler."

268.   There is no legitimate reason why the Government cannot fulfill its purpose by means that are not tantamount to solitary confinement.

269.   Although the contours of a reasonable period of detention has been said to be six months.

270.   The Supreme Court read § 1231 to authorize detention beyond the 90-day removal period only as reasonably necessary to secure the alien's removal. Id.

271.   The Supreme Court determined that six months is a presumptively reasonable period of detention. Id. at 689.

272.   Where an alien's removal was "no longer practically attainable" the detention no longer served the purported immigration purpose. Id.

273.   An alien under those circumstances must be released if he can show that there is no significant likelihood of his removal in the reasonably foreseeable future. Id.

274.   It is submitted that taking the factors at issue here with COVID-19 concerns, the attacks against Ms. Sorokin, among other factors, sufficient cause exists here for a finding of a change in circumstance that warranted reconsideration and a favorable review of the IJ's prior bond determination and relief should have been granted accordingly.

275.   Based on the foregoing, it is respectfully submitted that this Honorable Court should issue an order accordingly.

## Ms. Sorokin Has Been Denied Due Process Because
## The Immigration Judge Violated the Order of Judge Furman

276.   It is respectfully submitted that the denial of bond constitutes a due process violation as the Honorable Justice Furman has signed a ruling that mandates bond redetermination and the government has stipulated that within 14 days from the date of Justice Furman's order dated September 27, 2021, a bond hearing must be held.

277.   The Government did not meet its burden and the Judge's ruling shifted burden to Ms. Sorokin and this shifting violates due process.

278.   It is well settled that due process requires a bond hearing when an alien's detention under either Section 1187 or Section 1226(c) becomes unreasonable.

279.   In the Second Circuit, indefinite detention without a bond hearing under Section 1226(c) violates due process. Lora v. Shanahan, 804 F.3d 601, 613 (2d Cir. 2015), vacated 138 S. Ct. 1260 (2018).

280.   Indeed, "all circuits agree that section 1226(c) includes some 'reasonable' limit on the amount of time that an individual can be detained without a bail hearing." Id. at 614.

281.   In Lora v. Shanahan, the Second Circuit determined, as a matter of statutory interpretation, that Section 1226(c) included a six-month limit on the amount of time that an individual could be detained. Id. at 616.

282.   The Supreme Court has since vacated Lora v. Shanahan, 138 S. Ct. 1260, and the Second Circuit's six-month bright-line test is no longer controlling law. See Jennings v. Rodriguez, 138 S. Ct. 830, 846 (2018) (holding Section 1226(c) does not limit the length of an alien's detention).

283.   However, Lora v. Shanahan's reasoning—including that indefinite detention under Section1226(c) without a bond hearing violates due process—remains "strong persuasive authority." Sajous v. Decker, 2018 WL 2357266, at *7 (S.D.N.Y. May 23, 2018), appeal filed, No. 18-2591 (2d Cir. Aug. 30, 2018).

284.   Post-Jennings v. Rodriguez, courts in the Southern District of New York have concluded that aliens subject to mandatory detention under Section 1226(c) are entitled to bond hearings "when their continued detention becomes unreasonable and unjustified." See, e.g., Brissett v. Decker, 324 F. Supp. 3d 444, 451 (S.D.N.Y. 2018) (collecting cases).

285.   It is submitted that considering that Ms. Sorokin has been detained in jail for eight months, Judge Furman's order dated September 27, 2021, and the Government's failure to meet its burden, coupled with the fact that Ms. Sorokin is only receiving one hour of recreation time outside of the jail cell and is now at risk of COVID infection, is in danger of continued attacks, among other safety concerns, her continued detention has become unreasonable and sufficient cause

exists to warrant new considerations and an immediate exercise of discretion by this Court.

286.   Therefore, this court's exercise of discretion in Ms. Sorokin's favor is warranted, just and appropriate.

**Hon. Judge Charles Conroy should be ordered to recuse himself from this matter.**

287.   The Honorable Charles Conroy has demonstrated by his actions that he should not be presiding over this matter.

288.   Judge Conroy forced Petitioner to proceed with the hearing on her withholding application despite Petitioner requesting a continuance.

289.   Judge Conroy then informed Petitioner's counsel that he would be filing a grievance against her.

290.   Later, after Hon. Judge Furman ordered that Petitioner be granted a bail hearing, Petitioner's counsel was admitted to the Cardiac ICU on October 3, 2021.

291.   The Immigration Court initially scheduled Petitioner's Bond hearing for October, 4 2021 while Petitioner's counsel remained in the ICU.

292.   Counsel for Petitioner did not receive this Notice until October 4, 2021.

293.   Because counsel was hospitalized, she was forced to submit an Emergency Motion for telephonic appearance and the case was adjourned to October 7, 2021.

294.   Despite the fact that Counsel was still in the ICU, Judge Conroy forced the

Petitioner to proceed with the Bond Hearing represented by counsel that was still

in the hospital.

295.   Both the Petitioner and Petitioner's counsel have at numerous times felt

coerced by the orders and actions of Judge Conroy which have left them devoid of

any belief that Petitioner would receive a fair or impartial bond hearing.

296.   Based on the foregoing, it is respectfully submitted that this Court should

issue an order directing the Honorable Judge Conroy to recuse himself from this

action.

## **CLAIMS FOR RELIEF**

### **FIRST CAUSE OF ACTION**
### **8 U.S.C. § 1226(c) IS UNCONTISTUTIONAL AS APPLLIED TO ANY**

### **INDIVDUAL WHO WILL DE DETAINED MORE THAN SIX MONTH**

297.   Petitioner repeats and re-alleges paragraphs 1-297 of this petition

298.   Petitioner has now been detained for approximately eight (8) months without

any meaningful judicial custody review, as the Immigration Judge has engaged in a

pro forma review of the evidence in furtherance of his preconceived notion that

Petitioner is a danger to society.

299.   Given the liberty interest at stake the Governments authority to detain the

Petitioner under § 1226(c) must be limited to a six-month period subject to a

finding that the Petitioner is a flight risk or a danger to the community in an individualized bond hearing.

300.   Mandatory Detention under § 1226(c) beyond six months violates due process.

## SECOND CAUSE OF ACTION

## 8 U.S.C. 1226(c) DOES NOT AUTHORIZE MANDATORY DETENTION OF PETITIOENR AS THE GOVERNMENT HAS BASED HER REMOVAL SOLELY ON HER VISA OVERSTAY

301.   Petitioner repeats and re-alleges paragraphs 1-301 of this petition

302.   8 U.S.C §1226(c) provided for mandatory detention of any individual who "is deportable by reason of having committed any offense" enumerated in certain segments of the Immigration and Nationality Ace. 8 U.S.C. § 1226(c)(1)(B).

303.   Mandatory detention has no place in this instance as the Government has based the Petitioner's removal solely upon her visa overstay.

304.   For this reason, Petitioner is not properly detained under 8 U.S.C §1226(c) and must be granted a discretionary bond hearing pursuant to 8 U.S.C §1226(a).

## THIRD CAUSE OF ACTION

## Violation of the Right to Procedural Due Process

305.   Petitioner repeats and re-alleges paragraphs 1-305 of this petition

306.   8 U.S.C §1226(c) does not permit noncitizens to be detained without bond where no danger or flight rick can be reasonable presumed.  Demore, 538 U.S. at 535.

307.   Petitioner's detention under 8 U.S. §1226(c) is unconstitutional due to the (1) arbitrary manner in which the statute is applied to her; (2) the length of civil imprisonment, which will soon eclipse six months; (3) the length of time since her release from Criminal Detention; (4) the punitive and dangerous nature of her confinement in County jail which is identical to a penal institution; (5) her non frivolous applications for relief from removal, genuine attempts to provide a positive impact on the community, sole criminal conviction and the fact that the New York State Parole Board has already deemed that she is neither a flight risk or a danger to the community.

308.   Petitioner's detention is therefore unreasonable and violates the Due Process Clause.

## **FOURTH CAUSE OF ACTION**

## **8 U.S.C. § 1231 IS UNCONSTITUTIONAL AS APPLIED TO PETITIONER**

309.   Petitioner repeats and re-alleges paragraphs 1-309 of this petition

310.   In the Second Circuits decision on Hechavarria, the Court reasoned that "Section 1231assumes that the immigrant's removal is both imminent and certain" and an immigrant is only detained pursuant to §1231 if "no substantive

impediments remain to the immigrant's removal. Hechavarria v Session, 891 F.3d at 55.

311.   Here, the Petitioner's removal is not imminent or certain and substantive impediments remain to her removal.

312.   The Immigration Judge Ordered removal on June 15, 2021.

313.   This decision was appealed to the BIA.

314.   The Petitioner's brief was due on or about September 8, 2021 and that deadline has been met.

315.   The BIA appeal is now pending decision.

316.   The appeal the BIA may take months to resolve and therefore Petitioner's removal is neither imminent nor certain.

## FIFTH CAUSE OF ACTION

## DETENTION IN EXCESS OF 90 DAYS PURSUANT TO 8 U.S.C. § 1231 IS UNCONSTITUTIONAL

317.   Petitioner repeats and re-alleges paragraphs 1-317 of this petition

318.   Petitioner was issued a Final Order of Administrative removal on February 9, 2021 which was served on her on March 25, 2021.

319.   The Immigration Judge Ordered removal on June 15, 2021.

320.   It has been approximately five months since the Immigration Judge's order, which remains on appeal, and well over six months since the service of the Final Order of Administrative removal.

321.   Petitioner's detention has lasted now for approximately eight (8) months and counting.

322.   Petitioner's detention already has surpassed the 90-day period after which the alien shall be subject to supervision under regulations prescribed the Attorney General. 8 U.S.C. § 1231(a) (3)

323.   Petitioner's removal is not imminent or certain and her continued detention under 8 U.S.C. § 1231 is unconstitutional.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Petitioner prays that this Court grant the following relief:

1)    Assume jurisdiction over this matter; and

2)    Enjoin Respondents from moving the Petitioner from the Southern District while the habeas proceedings are pending

3)    Issue an order directing Respondents to immediately release Petitioner from custody on her own recognizance or on reasonable conditions of supervision; and or

4)    In the alternative, issue an order requiring Respondents to provide Petitioner with constitutionally adequate, individualized hearings within 48 hours at

which the Department of Homeland Security bears the burden of

establishing by clear and convincing evidence that continued detention is

justified in light of the grave risks to Petitioner's health and well-being in

ICE custody, and at which Petitioner's vulnerability to COVID-19 is

weighed as a factor in determining suitability for release; and at which

ability to pay and alternative conditions of release are considered, or to

immediately release Plaintiffs; and

5)    An order directing Judge Charles Conroy, a Judge of the Immigration Court,

New York, County, to recuse himself from all proceedings pertinent to Anna

Sorokin; and

6)    An award of reasonable attorneys' fees and costs for this action; and

7)    Grant any other and further relief that this Court deems just and proper.


Dated:  Queens, NY
           November 9, 2021

                                         Respectfully submitted,

                                         AUDREY A. THOMAS, ESQ.
                                         (Part 130 Certification – ID#: 4050548)
                                         The Law Office of Audrey Thomas PLLC
                                         *Attorney for Petitioner*
                                         245-07 Francis Lewis Blvd
                                         Rosedale, NY 11422
                                         718-276-2729(ph) 718-276-0196(fx)
                                         audreythomasesq@gmail.com