Exhibit P …………………………. Contracts with Netflix, RTL, HBO and Infonetwork

DocuSign Envelope ID: F7A7A9F9-0771-4274-A86A-E88F200848DC

# NETFLIX

May 9, 2019

By E-mail and Federal Express

Office of Victim Services
Alfred E. Smith State Office Building
80 South Swan Street – 2nd Floor
Albany, NY 12210
Attention: Eamonn Trainor
E-mail: eamonn.trainor@ovs.ny.gov

RE: Notification Under New York Executive Law §632-a(2) – Anna Sorokin a/k/a Anna Delvey

Dear Mr. Trainor

I refer to your letter dated June 22, 2018 (a copy of which is enclosed).

This letter is to notify you that Netflix Entertainment, LLC intends to exercise its option under the confidential term sheet with Anna Sorokin a/k/a Anna Delvey. Under the terms of the confidential term sheet, we are obligated to pay Ms. Sorokin the balance of the purchase price - i.e., $70,000, which represents the $100,000 purchase price less the $30,000 initial option fee paid last year. Accordingly, pursuant to your request and Executive Law §632-a(2), we hereby notify you that we intend to make this payment on or about June 11, 2019. Please contact us no later than June 10, 2019 if you contend that the balance due should be paid to some other entity, person or fund.

We also anticipate that the episodic royalties and consulting fees will become due within the next two years. We will notify you when these payments are due unless you otherwise instruct us not to do so. Thank you.

Very truly yours,

*Stefanie Markman*
Stefanie Markman

Cc: Todd Spodek
Jonathan Gardner

DocuSign Envelope ID: 41504293-AAAB-4EE9-A4EC-526A89FAD6D0

This binding term sheet is entered into as of June 8, 2018 by and between Anna Sorokin (a.k.a. "Anna Delvey") ("Owner") and Netflix Entertainment, LLC ("Company"). Owner and Company hereby agree as follows:

- **Initial Option**: $30,000 (applicable against the Purchase Price) for 12 months following signature of this short-form term sheet, subject to customary extensions (e.g., for force majeure, claim)
- **Extended Option**: $30,000 (non-applicable against the Purchase Price) for 12 months following expiration of the Initial Option period; subject to customary extensions (e.g., for force majeure, claim).
- **Purchase Price**: One-time payment of $100,000 in connection with the "Netflix Production" (which production may be a series, limited series, tv movie)
- If Company is unable to make payments directly to Owner for legal reasons (e.g., Owner's immigration status, Owner's criminal status), Company and Owner to consult with Company's legal counsel regarding alternate payment arrangements (e.g., letter of direction, escrow account). In no event shall Company's inability to make such payments due to legal reasons constitute a failure of consideration for the rights granted hereunder.

- **Granted Rights**:
  - If the Option is exercised, Owner hereby grants exclusive (and in some cases non-exclusive as set forth below) and irrevocable life story rights, including the right to dramatize and fictionalize Owner's life and experiences (and Owner to execute and assist in obtaining customary releases in connection therewith), throughout the universe in perpetuity in all media, including, without limitation, the right to use Owner's name or any variant thereof and likeness and to represent Owner's life and experiences as such are contained in any production produced hereunder and/or elements thereof, and the advertising, publicizing and exploitation of any such production(s). If the Option is exercised, Company to obtain all of Owner's life and experiences related to the Article on an exclusive basis; Company to obtain any other life rights of owner on a non-exclusive basis; provided, however, that Owner is held-back from exploiting (or giving third parties the right to) exploit the non-exclusive life rights that are incorporated into our production until 3 years after the initial exhibition of the final Netflix Production (except that in the case of a book about Owner's life story, such time frame shall be reduced to 1 year after the initial exhibition of the final Netflix Production hereunder as further set forth below).
  - Owner hereby releases Company, its successors, assigns and licensees, from any and all claims which at any time hereafter Owner may have or assert to have, arising out of or in connection with the Netflix service, any production produced pursuant to the rights granted hereunder and/or elements thereof and/or any use of Owner's name (or fictitious name or names if such are used) and/or depiction of Owner as an actual character thereof and/or the dialogue of such character; this release is intended to include, but is not limited to, any claim or claims that Owner may have based on defamation, right of publicity and right of privacy, statutory or otherwise.
  - Owner agrees that Owner will not (nor give any other the right to) do anything inconsistent with the grant of exclusive rights hereunder or consult or provide information to any other entity with respect to Owner's life story rights, including in connection with scripted, unscripted, talk or news programming and social or other websites. To further clarify, Owner cannot give the information that she is giving to Company about her life/experiences related to the Article/used in our production to any third party or post about it on social media etc.

- **Royalty**: $7,500 per original episode produced of any Netflix Production that is based on the life story rights of Owner.

- **Consultant Services**: If Owner is able to render actual services and if Company is legally allowed to engage her, then the following shall apply:
  - Fee: $15,000 per original episode produced
  - Services: Meaningful, part-time services, but must include reasonable availability for general consultation in connection with the production. Owner shall consult exclusively on this subject matter -

Owner shall not consult with or provide information regarding Owner's life story/this subject matter to any third party. For clarity, Owner cannot be involved in an unscripted show or documentary, etc. related in whole or in part to the rights granted hereunder while we are producing, nor can Owner appear on a talk show or post on social media about this story and/or her related experiences without Company's written approval in each instance for the period that is 3 years following initial exhibition of our last episode. The foregoing shall not preclude Owner from consulting on matters outside of her experiences related to the Article or this subject matter (so if she cures cancer in the future, we are not saying she can't consult on that, etc.).
  - Credit: If Owner is able to render services, then Company to consider some credit in good faith at the time
  - Owner to execute customary Consultant services agreement, which shall include customary work for hire language.

- **Reserved Rights:**
  -
  - REDACTED

- **Holdbacks:**

  REDACTED

- **Miscellaneous:** Nothing contained in this deal shall be construed to limit any rights to which Company may be entitled as a member of the public domain even if this deal was not in existence. Owner agrees to keep confidential the existence of this deal and the terms hereof and any matters related thereto (unless disclosure is pre-approved in writing by Company). All other terms subject to good faith negotiation. This agreement shall be governed by and construed and enforced in accordance with the laws of the State of California (United States of America). The parties agree any disputes arising under this term sheet and/or the long form agreement shall be resolved by binding arbitration in Los Angeles, California, pursuant to the JAMS Arbitration Rules and Procedures. The above terms shall be set forth in a long form agreement along with Company's other customary provisions (including without limitation, representations and warranties [including Owner's right to enter into this agreement with Company], indemnification, force majeure/incapacity/default, Company right to equitable/injunctive relief and Owner's waiver of equitable/injunctive relief), which long form agreement shall be negotiated in good faith within Company's customary parameters. Until such time as such long-form agreement is fully executed, the fully executed term sheet shall be binding upon the parties.

ACKNOWLEDGED & AGREED

_____
Anna Sorokin (a.k.a. Anna Delvey) ("Owner")

Netflix Entertainment, LLC ("Company")
By: *Danielle Johansen*
Its: Authorized Signatory

DocuSign Envelope ID: 41504293-AAAB-4EE9-A4EC-526A89FAD6D0

# SPODEK LAW GROUP P.C.

140 Broadway, 46th Floor New York, NY 10005 Tel: (212) 300-5196 Fax: (212) 300-6371
Email: info@spodeklawgroup.com Web: www.spodeklawgroup.com

**Letter of Direction to Netflix Entertainment, LLC**

I hereby irrevocably assign the initial payment of thirty thousand dollars ($30,000.00) for the "initial option" in the June 8, 2018 term sheet between myself and Netflix Entertainment, LLC to Spodek Law Group P.C located at 140 Broadway, 46th Floor New York, NY 10005.

You are hereby authorized and directed to pay Spodek Law Group P.C. directly.

**AUTHORIZED AND AGREED**

_____
Anna Delvey a/k/a Anna Sorokin

Dated: 6-12-18

Witness: _____
Todd A. Spodek, Esq.

# Agreement

Between            infoNetwork GmbH
                   Picassoplatz 1
                   50679 Cologne
                   Germany

                                              - hereinafter referred to as "infoNetwork" -

and

                   Ms. Anna Sorokin

                                              - hereinafter referred to as "Contractual Partner" -

                   c/o

                   Audrey A. Thomas, Esq.
                   245-07 FRANCIS LEWIS BLVD
                   ROSEDALE, NY 11422
                   New York
                   USA

Audrey Thomas acts as representative for Contractual Partner. Thomas warrants and represents to infoNetwork that Thomas is entitled to represent Contractual Partner and to enter into this Agreement for with Contractual Partner's express authority.

1. **Subject Matter of Contract**

   a) infoNetwork intends to make interviews and produce footage of Contractual Partner <u>exclusively</u> which shall contain the following ("production"):

   <u>First day:</u>
   - Picking up Contractual Partner on 02/11/21 and document Contractual Partner's first steps into freedom.
   - Filming Contractual Partner by exciting the prison, asking Contractual Partner questions and then driving Contractual Partner to Contractual Partner's friend's house. During the drive, asking Contractual Partner another questions, to get first impression.

   <u>Second day:</u>
   - Meeting Contractual Partner again the next day. Then, starting with a sit-down interview. infoNetwork will give Contractual Partner a chance to tell Contractual Partner's side of the story and agrees to report fair and balanced. Possible additional filming sequences:

     Broll with Contractual Partner at the apartment
     Contractual Partner's first zoom with Contractual Partner's parents (we'd like to interview them separately in Germany as well)
     Broll of you in NYC



b) In the event that Contractual Partner should not participate in production for whatever reason as specified under sub-clause a), infoNetwork shall be entitled to withdraw from this Agreement.

## 2. Compensation

a) For all services subject to section 1., transfer of rights by Contractual Partner subject to section 3. and exclusivity subject to section 4., infoNetwork shall pay a total compensation in the amount of

**€ 20.000,-- (in words: USD twenty thousand)**

Payment is due after termination of production and upon invoicing and payable after receipt of invoice within four (4) weeks. Invoice shall be sent to the following address:

> infoNetwork GmbH
> Katrin Raap
> Picassoplatz 1
> 50679 Cologne
> Germany

b) Contractual partner hereby offers infoNetwork and it's affiliated company RTL Television GmbH the exclusive first negotiation option to participate in a documentation (to be available for interviews and to provide private material). This option is granted until February 28, 2021.

c) Compensation under this Agreement shall be subject to tax in accordance with the laws of the Federal Republic of Germany. The Contractual Partner, who is domiciled in US, takes note that infoNetwork shall be obliged to deduct withholding tax at the rate stipulated by law from the payable remuneration forming the subject-matter of the Agreement, unless an exemption certificate from the German Tax Agency [Bundeszentralamt für Steuern] is submitted.

The Parties agree that the Contractual Partner shall be solely responsible for paying over taxes of any kind that are payable in connection with earnings made by the Contractual Partner. If infoNetwork is for any reasons whatsoever held liable for the payment of taxes on Compensation paid to the Contractual Partner, the Contractual Partner shall reimburse infoNetwork for the amounts paid or payable to the tax office or shall indemnify infoNetwork against claims of the tax office.

## 3. Transfer of Rights

a) Contractual Partner hereby grants to infoNetwork the right to take motion and still pictures of Contractual Partner and record Contractual Partner's name, voice, portrayal, performance, actions, likeness and/or use biographical information about Contractual Partner. Contractual Partner irrevocably grants to infoNetwork any and all rights in production. infoNetwork may use the production in whole or in part and in any manner without restriction at any time, in perpetuity, in any and all media (including, without limitation, all forms of television and interactive services such as online, mobile, social media etc.) now known and hereafter devised, without limitation or restriction of any kind. infoNetwork is entitled to sublicense all rights or parts thereof to third parties. The parties agree that Contractual Partner shall have no claim that the production subject to section 1 above has to be broadcasted or otherwise used.

b) Contractual Partner, hereby releases, holds harmless, promises not to sue and forever discharge infoNetwork from any and all claims, whatsoever that in any way are caused by, arise out of or result from this agreement, Contractual Partner's appearance in the production, or the exhibition of the production, on any legal theory whatsoever.

## 4. Exclusivity

a) With regard to production under section 1, Contractual Partner grants to infoNetwork <u>exclusivity</u>. In this regard, Contractual Partner warrants that Contractual Partner shall not give interviews or do otherwise appear on platforms of Media Companies, in particular TV stations, Press and Online Media.

Exclusivity shall begin upon signing of this Agreement, but no later than February 11, 2021 and terminates on February 28, 2021. In case of any breach of Exclusivity as specified above, Contractual Partner shall be liable, in lieu of any other penalty, for damages in amount of triple compensation as agreed under section 2. above. infoNetwork reserves the right to make any further claims (e.g. damages such as production costs).

## 5. Notices

All notices hereunder must be in writing and delivered by facsimile or by mail to the addresses set forth in the preamble to this Agreement.

## 6. Confidentiality

Contractual Partner shall keep all information that Contractual Partner becomes aware of during performance of this Agreement confidential. Contractual partner warrants not to disclose or pass on secret or confidential information of infoNetwork or any of infoNetwork's affiliates or subsidiaries to third parties.

## 7. Miscellaneous

This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof. The parties have not relied on any oral statements that are not included in this Agreement. Changes and additions to this Agreement have to be in writing. This also applies for waiver of writing. This Agreement shall be governed and construed in accordance with the laws of Germany. Legal Venue shall be Cologne.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

**infoNetwork GmbH**

By:_____

Name:_____

**Contractual Partner**

By: ANNA SOROKIN By her Attorney

Name: AUDREY A THOMAS ESQ. 2/9/202

X_____
ANNA SOROKIN

AUTHORIZATION TO USE ARTWORK

OWNER: *Alexi Sorota/Delany*

ADDRESS: *3395 State School Rd*
*Albion, New York 14411*

PHONE: _____

FAX: _____

PROGRAM TITLE: "Untitled Generation Project"

PRODUCTION COMPANY:
Invention Films LLC
26 Broadway, Suite 1301
New York, NY 10004

PHONE: _____

FAX: _____

This Authorization to Use Artwork (the "Agreement") is hereby entered into by and between _____ ("Owner") and Invention Films LLC ("Producer"). Producer is producing an episodic series currently entitled "Untitled Generation Project" (the "Series") in which _____ (the "Artwork") will be photographed and depicted. The parties agree as follows:

1. License. For good and valuable consideration, the receipt and sufficiency of which Owner hereby acknowledges, Owner hereby expressly grants to Producer, its successors, assigns, agents and licensees the irrevocable right and license to use the Artwork in whole or in part as incorporated in the Series and in all advertising and publicity therefor (including, without limitation, institutional advertising), and to exploit the Artwork as incorporated in the Series, and all footage, stills, and other materials shot during production of the Series, throughout the universe, in perpetuity, in all formats and media, whether now existing or hereafter devised. Owner acknowledges and agrees that Producer may alter, edit, or obscure the Artwork, that all creative decisions regarding the use of the Artwork shall be at the sole discretion of Producer, and that Owner has no right of approval in connection with the use of the Artwork as contemplated herein. Owner hereby expressly waives any rights of droit moral that may be afforded to Owner under the laws of any country in any capacity connected with the Artwork or its use in the Series. Producer may refer to the Artwork or any part or parts thereof by any fictitious name and may associate the Artwork with the occurrence of any fictitious event. Producer shall have no obligation to use any of the rights granted to it herein or to release or otherwise exploit the Series.

2. Full Release. Owner agrees that it will not claim or assert that any portrayal, depiction, exploitation, alteration, blurring, distortion or illusionary effect of or with respect to the Artwork constitutes a violation of any of its rights and Owner shall release Producer, its successors and assigns, from all claims arising out of or in connection with any portrayal, depiction, exploitation, alteration, blurring, distortion or illusionary effect of or with respect to the Artwork pursuant to this Agreement.

3. Representation and Warranties. Owner hereby represents, warrants and agrees that: (i) Owner has the full right and authority to enter into this Agreement and to grant the rights granted hereunder; (ii) it is not necessary for Producer to obtain the consent or permission of, or to pay any amounts (including royalties or residuals) to, any person, corporation or other entity in order to fully enjoy the rights granted hereunder; (iii) Producer's exercise of the rights granted hereunder will not violate or infringe upon the trademark, tradename, copyright or artistic and/or other rights of any third parties; (iv) the Artwork is free and clear of any liens or claims with respect to the use of the Artwork as permitted herein; and (v) Owner

macintosh hd users janishiawashington desktop invention films production packet (all) new artwork release (generation project) dsx

1

will indemnify and hold harmless Producer, its employees, associates (including, but not limited to, any financiers or distributors), successors, designees, licensees, and assigns, from any and all claims, demands, suits, losses, costs, expenses (including reasonable counsel fees), damages or recoveries which may be obtained against, imposed upon or suffered by Producer, its employees, associates, successors, designees, licensees and assigns, by reason of Owner's breach of any of the representations, warranties or agreements contained herein.

4. Rights as Member of the Public. Producer's rights as a member of the public shall not be limited by this Agreement, and Producer may exercise such rights as though this Agreement were not in existence.

5. Confidentiality. Owner shall not disclose to any third party any information regarding the Series and/or the possible inclusion of the Artwork in and in connection with the Series.

6. Remedies. Owner's rights and remedies in the event of any breach or alleged breach of the Agreement by Producer will be limited to the right, if any, to recover money damages in an action at law, and in no event will Owner be entitled by reason of any such breach or alleged breach to terminate this Agreement or to seek any equitable remedy, including, without limitation, injunctive relief or any other equitable remedy which would enjoin, restrain or otherwise hinder the production, distribution, exhibition, advertising or any other means of exploitation of the Series or any subsidiary or ancillary rights in connection therewith.

7. Assignment. Producer shall have the right to transfer or assign its rights and/or obligations pursuant to this Agreement to any other person, corporation or entity, and shall be relieved of its obligations to Owner hereunder to the extent such obligations are assumed by such person, corporation, or entity. Owner may not assign this Agreement or any rights hereunder, in whole or in part, without Producer's prior written approval, and any such purported assignment shall be null and void.

8. Entire Agreement. This Agreement shall be construed in accordance with the laws of the State of New York, applicable to agreements which are executed and fully performed within the State of New York, exclusive of conflicts-of-laws principles. The invalidity, illegality or unenforceability of any provision or clause contained in this Agreement will not affect the legality or enforceability of the remainder of the provisions of this Agreement. This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior agreements, representations and warranties, both oral and written, if any, made with respect to the subject matter hereof, and may be amended only by written agreement executed by both of the parties hereto.

*[Signature Page Follows]*

macintosh hd:users:lanishiawashington:desktop:invention films:production packet (all):new artwork release (generation project).doc

2

This Agreement dated ___9/14___, 20_10_ shall be effective upon the signature of authorized representatives of Owner and Producer.

INVENTION FILMS LLC

By: _____(LM)_____
Authorized Representative

OWNER:

By: _____/s/_____
Authorized Representative

macintosh hd:users:lanishawashington:desktop:invention films:production packet (all) new:artwork release (generation project).doc

DocuSign Envelope ID: 895F97C4-7D5F-44D7-AC7C-0D5AD1FC991B

March 8, 2021

Dear Anna Delvey aka Anna Sorokin:

This is to confirm the terms of the agreement ("Agreement") between Anna Delvey aka Anna Sorokin ("Participant") c/o The Law Office of Audrey Thomas PLLC, 245-07 Francis Lewis Blvd, Rosedale, NY 11422 on one hand, and ImageWorx Media GmbH ("Producer") of Barer Str. 47, 80799 Munich, Germany, on the other, regarding the filming of a profile interview including associated b-roll and personal materials license for use in a multimedia journalism biography covering Participant's childhood life, alleged criminal activities, time behind bars, and plans for the future (the "Project"). In consideration of the mutual promises and covenants exchanged herein, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Participant will make herself available to Producer for an interview and other filming broll opportunities supportive to the Project at Participant's home in New York City and other nearby locations as shall be mutually agreed in good faith. This filming shall commence on Friday, March 12 or as otherwise agreed in writing, but no later than seven days following execution of this agreement, and Participant shall make herself available for no less than one full day of filming on the agreed date.

    Approximate filming schedule:
    9 – 10 Set up camera equipment inside her apartment while meantime Anna has hair / makeup
    10 – 10:30 film Anna inside her apartment finishing touches makeup, then trying on outfits
    10:30 – 12:30 interview with breaks
    12:30 – 1:30 lunch
    1:30 – 2:30 wrap equipment + more video around apartment, on phone, looking out window, etc.
    2 – 3 limo ride including short interview inside, film exterior video at parole office
    3 – 6:30 additional filming around Manhattan, various locations as might be mentioned in interview, or might be Anna's favorite hangouts. It would be good to invite friends.
    6:30 – 7 return Anna to her home

    The interview topics will specifically include but not be limited to Participant's childhood, her arrival in New York, her alleged crimes, her trip to Morocco, her arrest, conviction, and time behind bars, the status of her current legal appeals, immigration status, and her plans for the future. The broll opportunity is to may include (but is not limited to) hero shots, visiting restaurants, shopping, limo, exterior of parole office, galleries, in-person with friends, video meetings with friends, and/or family, and such relevant events as may be happening or might be organized during this timeframe. All filming opportunities during this day will be exclusive to Producer with no other cameras present, and everything that transpires on this day is considered on-the-record.

1



2. The Project, all multimedia materials gathered in its creation ("the Materials"), and their proceeds will belong entirely to Producer, which may use them in perpetuity, in all media existing now or later invented, including licensing this footage for use by others ("Publish").
3. Participant also agrees to furnish Producer with many personal photographs and videos ("Personal Images") and hereby provides Producer with unlimited non-exclusive license in all media, in perpetuity, to use Participant's image and likeness regardless of source, ownership, and format. The Personal Images, no less than fifty (50), will cover Participant's childhood, arrival in New York, high life in New York, the period of her alleged crimes in 2016 and 2017 (including the 2017 trip to Morocco), and to the best of her ability other visual documentation relevant to the Project as may be requested by Producer.
4. Producer and its licensees have the irrevocable right and option Publish the Project, Materials and Personal Images in all media worldwide, in perpetuity. Within the German media market (including Germany, Austria, and Switzerland) Producer will have an additional exclusive right and option beginning on the date of signature below and concluding forty-five days later (45 days) (the "Exclusive Period") during which time Participant may not grant any other interviews in video, print, audio, or online for air or publication in the German market during the Exclusive Period. Following the Exclusive Period, Producer and licensees shall retain the non-exclusive right to air, broadcast, or publish the Project in any media including online, in perpetuity, worldwide, including the German market.
5. Participant represents, warrants and covenants that: (a) any Material or Personal Images provided by Participant (excluding material provided in whole or in part by Producer), including, without limitation, any content created or provided for the Project, is original with Participant or in the public domain; and (b) that Participant has the legal right and authority to enter into this Agreement, grant the rights granted hereunder, and perform all respective obligations hereunder. Participant agrees to indemnify and hold Producer and Producer's assignees, licensees, officers, directors, trustees, agents, employees and associates, harmless from and against any charges, damages, costs, expenses (including reasonable outside attorneys' fees), judgments, penalties, liabilities or losses of any other kind or nature (collectively, "Claims") which may be sustained or suffered by or secured against or imposed upon Participant or Participant's assignees, licensees, or associates to the extent by reason of Participant's material breach of any of the foregoing representations, warranties and covenants.
6. Producer agrees to pay Participant for her participation in the Project the total sum of $15,000 (fifteen thousand dollars) for all of the above, and according to the following schedule:
    a) **First Payment** of $7,500 due within 48 hours after successful completion of a 1-day interview.
    b) **Second Payment** of $7,500 due within 48 hours after Participant has provided Producer with sufficient Personal Images as may be mutually agreed in good faith and as may be practical. At the Producer's discretion the Second Payment may be combined and paid at the same time as the First Payment if the relevant terms are met, but not before.
7. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to agreements executed and wholly performed therein. This

2



DocuSign Envelope ID: 895F97C4-7D5F-44D7-AC7C-0D5AD1FC991B

Agreement contains the full and complete understanding between Participant and Producer with reference to the Project, supersedes all prior agreements, negotiations, representations and/or understandings (if any) between Participant and Producer (whether written or oral) with respect to the Project, and cannot be modified or amended except by a written instrument executed by both parties. Participant's remedy for any breach by Producer of this Agreement shall be an action for money damages, in no event will Participant be entitled to terminate or rescind this Agreement or enjoin or restrain the exploitation of the Project. This Agreement may be signed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. A signed and delivered facsimile copy of this Agreement, or a signed copy transmitted electronically shall be binding on the party signing the facsimile or electronically transmitted copy, and such copy shall have the same effect as the original. Any dispute, claim or controversy arising out of or relating to this Agreement, including the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in New York before an arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in such rules. Judgment on the award may be entered in any court having competent jurisdiction. This clause shall not preclude either Party from seeking enforcement of the provisions hereof from a court of appropriate jurisdiction. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT.

All parties' signatures below, together with the words "AGREED TO AND ACCEPTED" shall constitute this a valid, binding and enforceable agreement between the parties.

_____
Alexandros Simos
President, ImageWorx

Agreed by _____
Anna Delvey aka Anna Sorokin
Participant
[signature: As Attorney for Anna Sorokin AKA Anna Delvey]

3/9/2021
On (date)

DocuSign Envelope ID: 895F97C4-7D5F-44D7-AC7C-0D5AD1FC991B

## PARTICIPATION AGREEMENT / RELEASE FORM

**between Imageworx Media GmbH (Producer)**, Barer Str. 47, 80799 Munich, Germany

and

**Anna Delvey aka Anna Sorokin (Protagonist),** C/O The Law Office of Audrey Thomas PLLC, 245-07 Francis Lewis Blvd, Rosedale, NY 11422

**Contractual Object:** The contractual object of this agreement is the shooting of an interview about the life and legal challenges of Anna Delvey and the resulting footage from this filming, proposed to be executed by the Producer in February and March 2021. The Protagonist participates in this project and agrees to be filmed for the said project.

The producer and the protagonist agree to the following transfer of rights:

**Transfer of rights:** The protagonist herewith transfers the following rights to the producer: The exclusive use of the filmed footage about his/her person without any time limit or restriction, any location restrictions or content -related restrictions. This transfer of rights especially includes the right to publish the footage, reproduce and distribute the footage via TV, Internet and on demand platforms. The contractual object / footage can be edited and mixed with other film-/audio- and photo-material, can be combined with graphics and text, altered, scaled or cropped by the producer. The producer has the right to transfer these rights as well as the final product (the film) to third parties.

**Warranty:** The protagonist guarantees to be authorized and able to sign and fulfill this contractual agreement. The protagonist especially guarantees that no third party or third party rights prevent the fulfillment of this contract.

Changes and additions to this agreement need to be in writing.

Date & Location

| DocuSigned by: | DocuSigned by: |
|---|---|
| FFA512F2DB32451... | 828A05E3843841A... |
| Producer | Protagonist / Interviewee |

4